**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MEDIAVINE, INC.,** | Civil Action No. 1:26-cv-2329 |
| *Plaintiff*, | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| v. | |
| **GOOGLE LLC and ALPHABET INC.,** | **JURY TRIAL DEMANDED** |
| *Defendant*. | |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

PARTIES .............................................................................................................................. 6

JURISDICTION AND VENUE .......................................................................................... 7

FACTUAL ALLEGATIONS ............................................................................................... 8

    I.      BACKGROUND ........................................................................................ 8

          A.     Mediavine's Business.................................................................... 8

          B.     The Ad Tech Pipeline ................................................................ 11

    II.     MARKET DEFINITION AND MONOPOLY POWER ..................................... 14

          A.     Publisher Ad Servers for Open-Web Display Advertising........................ 14

               1.     Market Definition........................................................14

               2.     Monopoly Power.........................................................18

          B.     Ad Exchanges for Open-Web Display Advertising ................................. 20

               1.     Market Definition........................................................20

               2.     Monopoly Power.........................................................22

    III.   GOOGLE'S EXCLUSIONARY CONDUCT ...................................................... 25

          A.     Google Ties AdX to AdWords ....................................................... 25

          B.     Google Ties DFP to AdX ............................................................ 29

          C.     First Look.......................................................................... 31

          D.     Header Bidding ..................................................................... 33

          E.     Last Look .......................................................................... 35

          F.     Enhanced Dynamic Allocation ...................................................... 36

          G.    Bernanke and Alchemist ............................................................ 40

          H.    Dynamic Revenue Sharing ......................................................... 45

          I.     Exchange Bidding.................................................................. 47

i

J.     Minimum Bid to Win ..................................................................... 49

K.     Poirot............................................................................................ 52

L.     Data Redactions ........................................................................... 55

M.     Unified Pricing Rules.................................................................... 57

IV.     PRIOR COURT DECISIONS................................................................ 59

A.     Collateral Estoppel........................................................................ 59

B.     Multidistrict Litigation Dismissal Decisions ............................... 61

V.     MEDIAVINE'S ANTITRUST INJURY ................................................ 62

VI.     STATUTE OF LIMITATIONS ............................................................. 70

A.     Google's Pattern of Conduct Constitutes a Continuing Violation ............ 71

1.     AdWords-AdX Tie .......................................................71

2.     DFP-AdX Tie.................................................................71

3.     Google's Conduct Enhancing its Product Ties Are Continuing Violations .................................................................72

B.     Google Fraudulently Concealed Project Bernanke, EDA, DRS, and Project Poirot into the Statutory Period................................................. 74

CLAIMS ........................................................................................................... 76

I.     COUNT ONE – MONOPOLIZATION AND MONOPOLY MAINTENANCE OF THE AD SERVER MARKET (SHERMAN ACT § 2) ................................... 76

II.     COUNT TWO – MONOPOLIZATION AND MONOPOLY MAINTENANCE OF THE AD EXCHANGE MARKET (SHERMAN ACT § 2) ......................... 79

III.     COUNT THREE – ATTEMPTED MONOPOLIZATION OF THE AD EXCHANGE MARKET (SHERMAN ACT § 2).................................................. 81

IV.     COUNT FOUR – UNLAWFUL TYING (SHERMAN ACT § 1)........................ 83

V.     COUNT FIVE – UNLAWFUL DECEPTIVE ACTS OR PRACTICES (NEW YORK GENERAL BUSINESS LAW §§ 349-50) ............................................... 85

VI.     COUNT SIX – COMMON-LAW FRAUD ........................................................ 88

VII.     COUNT SEVEN – UNJUST ENRICHMENT...................................................... 92

PRAYER FOR RELIEF ........................................................................................................ 93

DEMAND FOR JURY TRIAL ............................................................................................. 94

**INTRODUCTION**

1.      The internet runs on free content. Millions of Americans access news, information, entertainment, and educational resources every day without paying a cent. That is possible because publishers fund their operations by selling advertising space called "display ads" on their webpages.

2.      Modern display advertising technology ("ad tech") is an advanced form of an old business model. Advertisers have long paid to place their messages alongside interesting and relevant content—in newspapers, in magazines, and now on the web. When it works, this model benefits everyone: publishers earn the revenue they need to produce content, advertisers reach the audiences they seek, and consumers enjoy a wealth of free information and services.

3.      The internet transformed this model by enabling publishers to sell ads in real time through automated auctions. In milliseconds, specialized intermediary technologies match each publisher's ad impression with the advertiser willing to pay the most for it. When that process operates competitively, it maximizes publishers' revenue and advertisers' return on investment. That revenue, in turn, funds the content, goods, and services Americans consume every day.

4.      The ad tech ecosystem, however, is not operating competitively. One company, Google, holds monopoly power over two of the key technologies that publishers use to sell their advertising inventory: the publisher ad server and the ad exchange. Google's dominance gives it the ability to control how publishers' inventory is sold, to whom, and on what terms. Google has used that power to extract enormous monopoly rents from every dollar that advertisers spend to reach publishers' audiences. Those rents come directly out of publishers' pockets, undermining the business model that makes so much free content possible.

5.      A "publisher ad server" manages a publisher's advertising inventory and makes the final decision on which ad appears on a given webpage. When a user loads a page, the ad

1

server solicits bids from competing demand sources, evaluates those bids, and serves the winning ad to the user's browser. It is the publisher's primary point of control over its inventory. Today, Google's publisher ad server, DoubleClick for Publishers ("DFP", now part of Google Ad Manager ("GAM")) commands over 90% of the publisher ad server market worldwide.

6.    An "ad exchange" connects publishers' inventory to advertiser demand at scale. When a publisher's ad server solicits bids, participating exchanges conduct real-time auctions among their affiliated advertisers and submit the winning bid back to the ad server. Exchanges earn revenue by taking a percentage of each transaction. Google's ad exchange, DoubleClick Ad Exchange ("AdX," now also part of GAM) controls between 60% and 70% of the exchange market.

7.    Google did not earn its dominant position in the ad server and exchange markets through competition on the merits. Instead, Google acquired and maintained monopoly power through an evolving course of anticompetitive conduct designed to undermine rivals and to steer ever more inventory and ad dollars through its own products.

8.    First, Google tied its vital buy-side tools, its ad exchange, and its ad server together. This multi-level tying arrangement locked publishers into using Google's ad server. Then, Google implemented a series of auction manipulation practices that further entrenched and enhanced the tie between its exchange and ad server while also defeating industry efforts to reintroduce competition to ad tech. The combined and accumulating effect was to deprive publishers of the competitive auction dynamics that would have maximized their revenue, while Google extracted ever-larger monopoly rents.

9.    Google's tying structure also suppresses competition for publisher inventory sold outside Google's stack. By restricting AdWords demand to AdX and restricting AdX real-time

bidding to DFP, Google prevents that demand from competing for impressions sold through independent exchange auctions, including the inventory sold through Mediavine's Journey platform. In a competitive market, that demand would flow across multiple exchanges competing for those impressions, increasing bids and clearing prices for publishers.

10.     Google's conduct has had devastating consequences. Google generates tens of billions of dollars in annual profits from its ad tech monopolies. Publishers, meanwhile, are struggling to stay afloat. They cannot invest in the journalism, commentary, and creative work that attracts the audiences advertisers want to reach. Some have cut staff. Others have shut down entirely. This trajectory threatens the very model that makes free online content possible. At a minimum, it is restricting the output of quality content available to American consumers.

11.     Google's conduct drew scrutiny from competition enforcers in the United States and around the world. In December 2020, a group of State Attorneys General filed suit against Google alleging monopolization of the ad server, ad exchange, and other ad tech markets. *See Texas v. Google LLC*, No. 20-cv-00957 (E.D. Tex.).

12.     Private publisher plaintiffs also filed their own actions seeking damages based on the injuries they suffered from Google's antitrust violations. Some of those publishers sought to represent all similarly situated publishers in a class action. Those private actions were ultimately consolidated into a multidistrict litigation in this Court. *See In re Google Digital Advertising Antitrust Litigation*, No. 21-md-3010 (S.D.N.Y.) (the "MDL").

13.     In January 2023, the United States Department of Justice and additional State Attorneys General filed their own lawsuit in the Eastern District of Virginia based on substantially the same monopolization theories. That case ultimately reached trial first, and Judge Brinkema subsequently issued a 115-page opinion holding that Google "willfully engaged in a

series of anticompetitive acts to acquire and maintain monopoly power in the publisher ad server and ad exchange markets for open web advertising" and unlawfully tied "its publisher ad server and ad exchange together." *United States v. Google LLC*, 778 F. Supp. 3d 797 (E.D. Va. 2025) ("EDVA Liability Op."). Judge Brinkema specifically found that "this exclusionary conduct substantially harmed Google's publisher customers."

14.    In October 2025, this Court ruled that Judge Brinkema's findings have preclusive effect on private publisher plaintiffs' claims in the MDL through the doctrine of collateral estoppel. *In re Google Digital Advertising Antitrust Litig.*, 2025 WL 3012840 (S.D.N.Y. Oct. 27, 2025) ("Issue Preclusion Order"). The Court foreclosed Google from relitigating liability on the key antitrust liability issues, including its possession of monopoly power in the publisher ad server and ad exchange markets, its willful acquisition and maintenance of that monopoly power through a series of anticompetitive acts, and its unlawful tying of its publisher ad server to its ad exchange.

15.    Two months later, this Court issued an order certifying an "AdX Publisher Class" comprised of "all persons or entities in the United States that directly paid Google, through payment of fees directly to Google or reductions in advertising revenue received directly from Google, for services associated with selling advertising impressions on websites via Google's AdX Ad Exchange from December 15, 2016 through March 31, 2024, with the exception of any claim arising from instream video transactions." MDL ECF No. 1266 at 77.

16.    In the same order, this Court concluded that "multi-customer management firms ('MCMs') are properly included in the AdX Class because any injuries that they suffered would be identical to the injuries of open-web publishers." MDL ECF No. 1266 at 2. Specifically, the Court held that AdX Publisher Class includes "Manage Inventory" MCMs, which it defined as

4

MCMs for which "Google directly pays the parent MCM firm for inventory sold by the child publisher, and the parent is then responsible for making payment to the child." MDL ECF No. 1266 at 41.

17.     Plaintiff Mediavine, Inc. ("Mediavine") is a Manage Inventory MCM. As a Manage Inventory MCM, Mediavine licenses and pays for Google's ad tech tools—including Google's publisher ad server and ad exchange—and uses those tools to manage ad operations for over 17,000 independent publisher websites.[1] Mediavine controls the entire ad sale process for its publishers: it embeds its proprietary ad code on each publisher's website, configures the ad server, determines which exchanges may bid for its publishers' inventory, and makes all decisions regarding ad layout, pricing strategy, and demand-source selection. Mediavine's publishers' websites are overwhelmingly free to the public, and digital advertising revenue is the lifeblood of their operations. Without Mediavine's ad management services, the vast majority of these publishers could not sustain their businesses or continue producing the content that millions of Americans rely on every day.

18.     Mediavine has been harmed by Google's anticompetitive conduct. Google's monopolistic practices have depressed the prices Mediavine receives for its publishers' inventory, forced Mediavine to transact through Google's exchange on anticompetitive terms, and deprived Mediavine of the competitive marketplace that would have maximized the value of every impression it sells.[2]

---

[1] Of its more than 17,000 publishers, Mediavine works with two as a Manage Account MCM, as the term is described in the Court's class certification order. MDL ECF No. 1266 at 41.

[2] During the relevant period, Mediavine has also sold open-web display ad inventory for several owned and operated websites. For ease of reference in this Complaint, references to harm to Mediavine include harm suffered by Mediavine in connection with both its managed publisher inventory and its owned-and-operated websites as a result of Google's anticompetitive conduct.

19.    Mediavine brings this action in its own right on information and belief to recover for that injury and to obtain injunctive relief necessary to restore competition in the ad tech markets on which it and its publishers depend.

## PARTIES

20.    Plaintiff Mediavine, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business in Delaware. During the relevant period, Mediavine personnel involved in contracting and interacting with Google, and in managing Mediavine's use of Google's ad tech products, included individuals located in this District who participated in the negotiation, implementation, and operation of those products.

21.    Defendant Google LLC is a limited liability company organized under Delaware law, with its principal place of business in Mountain View, California. Google is, among other things, an online advertising company providing Internet-related products, including various online advertising technologies, directly and through its subsidiaries and business units. Google maintains a substantial office in this District at 111 8th Avenue, New York, New York 10011. Indeed, "Google's second-largest corporate presence is in New York (where much of its ad tech business is located)." Mem. at 21, *United States v. Google LLC*, No. 1:23-cv-00108 (E.D. Va. Feb. 17, 2023), ECF 44-2.

22.    Defendant Alphabet Inc. is a publicly traded Delaware corporation headquartered in Mountain View, California. Alphabet was created in late 2015 as a holding company for Google and controls Google's day-to-day operations. An overwhelming majority of Alphabet's revenue derives from Google. Since December 2019, Alphabet and Google have shared the same Chief Executive Officer. Given Alphabet's operational control, Google functions as Alphabet's

alter ego. This Complaint uses "Google" to refer to both Google LLC and Alphabet Inc. collectively.

**JURISDICTION AND VENUE**

23.     This action arises under the federal antitrust laws, including Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because the claims arise under Acts of Congress regulating commerce. Plaintiff seeks treble damages, costs, and attorneys' fees under 15 U.S.C. § 15(a), and injunctive and equitable relief under 15 U.S.C. § 26.

24.     Plaintiff also asserts claims under New York General Business Law §§ 349 and 350 and related state-law causes of action arising from the same course of conduct. This Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy as the federal claims.

25.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, which authorizes nationwide service of process and provides for jurisdiction over corporate defendants that reside, are found, or transact business in this District. Defendants are incorporated in Delaware, maintain their principal places of business in the United States, transact substantial business throughout this District and the United States, and purposefully direct their advertising-technology products and services to publishers, advertisers, and consumers located in this District. Defendants' conduct alleged herein was carried out in substantial part within this District and has caused injury to Plaintiff and competition in this District.

26.     Venue is proper in this District pursuant to 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants reside in, are found in, and transact business in this

7

District, and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

27.     Defendants maintain substantial operations in this District, including significant personnel and business functions relating to their advertising technology products and services. Upon information and belief, a material portion of Defendants' advertising and ad tech operations are conducted from offices located in New York, including personnel responsible for publisher relationships, advertising sales, product development, and account management. Plaintiff regularly communicated and transacted with Google personnel located in this District in connection with the licensing and use of Google's advertising technology tools. Meetings between Plaintiff and Google representatives occurred in this District, and numerous relevant witnesses—including digital publishers, advertisers, industry participants, and former Google employees—are located in or around this District. Google itself has previously represented to federal courts that New York houses one of its largest corporate presences and that substantial portions of its ad tech business and relevant witnesses are based here. Venue in this District is therefore not only proper but also closely connected to the conduct and witnesses at issue.

28.     Defendants' activities were undertaken in the flow of interstate commerce and have had a direct, substantial, and reasonably foreseeable effect on interstate trade and commerce within the United States and in this District. The statutory prerequisites for federal jurisdiction, personal jurisdiction, and venue are therefore satisfied.

<strong>FACTUAL ALLEGATIONS</strong>

**I.     BACKGROUND**

**A.     Mediavine's Business**

29.     Mediavine is a digital advertising technology company headquartered in Delaware. Mediavine exclusively manages and monetizes advertising inventory for more than

17,000 independent publisher websites and content creators across the United States. Mediavine has served billions of advertising impressions through programmatic auctions conducted on major advertising exchanges, including Google's AdX.

30.    Mediavine's commercial relationship with Google began over a decade ago and has been continuous throughout the relevant period. Since that time, Mediavine has paid Google many millions of dollars in exchange fees and related charges and has received billions of dollars in advertising revenue through Google's systems, subject to Google's take rates and auction mechanics. Mediavine also pays Google millions of dollars a year in fees to license GAM. Due to the high volume of publishers Mediavine serves, Mediavine currently licenses three instances of GAM. Today, Mediavine acts as a Manage Inventory MCM and contracts directly with Google for approximately 11,000 of its publisher websites.

31.    When a user loads a page on a Mediavine-managed website, proprietary Mediavine code—which publishers are contractually required to embed and may not modify— initiates the auction and routes the impression through Mediavine's instance of Google's ad server, DFP. The publisher does not control the auction logic, routing decisions, exchange configuration, or advertiser selection. Mediavine does.

32.    In each auction, Google identifies Mediavine as the "seller of record" for the advertising inventory sold. Google pays Mediavine directly for impressions transacted on AdX. There is no intermediary in the distribution chain between Google and Mediavine in these transactions; Mediavine contracts directly with Google, transacts directly with Google, and receives payment directly from Google.

33.    Mediavine exercises independent economic judgment and control over:

      a.    which exchanges may bid on inventory;

9

    b.      floor pricing and auction configuration;

    c.      yield optimization strategies;

    d.      advertiser eligibility and prioritization;

    e.      code deployment and data signals;

    f.      participation in Google's products and programs.

34.    Mediavine's publishers do not direct those decisions and do not transact directly with Google for the managed inventory.

35.    Mediavine bears commercial risk in its operations. It is compensated for its programmatic auctions through a percentage share of advertising revenue generated. The number of impressions sold through Mediavine's platform varies continuously with website traffic, advertiser demand, and real-time auction outcomes. Neither publishers nor advertisers commit to purchase or sell any fixed quantity of impressions in these auctions. Accordingly, Mediavine's revenue fluctuates with auction outcomes, advertiser demand, pricing, and traffic volume.

36.    Mediavine is a Manage Inventory MCM parent publisher.[3] ECF No. 1266, at 41. Mediavine as the parent publisher—not its child publishers—licenses, contracts for, and pays for Google's publisher-facing ad tech tools. Mediavine executes those agreements in its own name and under its own contractual relationship with Google. Google pays Mediavine directly for inventory sold by the child publishers, and Mediavine is then responsible for making payments to its child publishers.

37.    Mediavine also operates a product called Journey, which provides advertising monetization services for smaller publishers that Google will not approve to participate in the MCM program. Journey is Mediavine's header-bidding offering that runs real-time auctions for

---

[3] For purposes of this Complaint, Mediavine refers to itself as both a publisher and an MCM.

publisher inventory across multiple non-Google demand sources, including competing ad exchanges. When a user loads a webpage on a Journey publisher's site, Journey's code initiates an auction among participating exchanges and selects the highest eligible bid to serve the advertisement. Like Mediavine's primary MCM platform, Journey manages the technical integration with participating demand sources, configures auction parameters, and provides reporting and optimization tools that allow publishers to monetize their inventory through programmatic advertising. Journey embeds proprietary code on publisher websites and administers the auction process on the publisher's behalf, including determining which exchanges may participate in auctions and how bids are evaluated. Journey therefore functions as an integrated monetization and auction-management system for publishers whose inventory is sold through programmatic advertising channels but who cannot access GAM.

### B.    The Ad Tech Pipeline

38.    The sale of an open web display ad impression takes only milliseconds, and billions are sold each hour. To facilitate so many near-instantaneous transactions, digital publishers pass their inventory through a sophisticated pipeline of specialized, interconnected ad tech products. These products connect publisher supply on one end to advertiser demand on the other. The different products along the pipeline serve different functions.

39.    The earliest ad tech tools were "ad networks." These rudimentary tools pooled inventory across the Internet for sale to advertisers affiliated with the network. Ad networks still exist, but they offer limited functionality and do not permit publishers to sell impressions to advertisers outside the network. For that reason, sophisticated publishers such as Mediavine typically route their ad impressions through a suite of other demand sources that provide greater control and greater monetization opportunities.

40.   Digital publishers selling open web display ads generally plug into the ad tech pipeline through "publisher ad servers." The ad server manages a publisher's advertising inventory and decides which ad will display on a given webpage. When a user navigates to a webpage, the publisher's ad server solicits bids from various demand sources—including ad exchanges, ad networks, and direct advertisers—evaluates those bids according to the publisher's preconfigured rules, and serves the winning ad to the user's browser. The ad server thus functions as a publisher's primary point of control over its inventory. It determines who may bid, how bids are evaluated, and which demand source ultimately wins. Header bidding, discussed in more detail below, provides an alternative method to access demand.

41.   In a competitive market, publisher ad servers would compete to help publishers better monetize their inventory. Ad servers would differentiate themselves by offering superior tools for managing demand sources, more transparent reporting, and auction configurations that maximize publisher revenue. Publishers could switch between ad servers based on performance, and that competitive pressure would drive innovation and keep fees in check. A publisher dissatisfied with one ad server's features or pricing could credibly threaten to move its inventory elsewhere.

42.   Mediavine licenses Google's publisher ad server, formerly called DoubleClick for Publishers ("DFP") and now part of Google Ad Manager ("GAM"), to sell advertising inventory on its publishers' websites.

43.   The next segment in the ad tech pipeline is the "ad exchange." Ad exchanges are hubs that connect publishers' inventory from several sources to advertiser demand at scale. An exchange aggregates demand from many advertisers and conducts real-time auctions for individual impressions. When a publisher's ad server requests bids, participating exchanges

12

auction the impression among their affiliated advertisers and submit the winning bid to the ad server. Exchanges earn revenue by taking a percentage of each transaction they intermediate: typically between 10% and 20%. A competitive exchange market would give publishers access to diverse demand sources and drive transaction fees downward.

44.     In a competitive market, ad exchanges would compete both to maximize publishers' returns and advertisers' ROI. They do so by seeking to match each site visitor with the advertiser that values it most. An exchange that consistently delivers strong matches benefits both sides: publishers earn more for their inventory, and advertisers reach the audiences most likely to convert. To achieve this, an exchange must attract both supply (publisher inventory) and demand (advertiser spending). In a competitive market, exchanges would vie for publishers by offering access to unique advertiser demand, lower transaction fees, and transparent auction mechanics. They would compete for advertisers by offering access to premium inventory and efficient bidding tools. Exchanges that failed to deliver strong matches would lose inventory and demand to rivals, while exchanges that extracted excessive fees would be undercut by lower-cost alternatives.

45.     Google's ad exchange, of which Mediavine is a customer, was formerly called DoubleClick Ad Exchange ("AdX"), but it is now part of GAM.

46.     On the advertiser side of the pipeline are "demand-side platforms" ("DSPs") and other ad-buying tools. These tools allow advertisers and their agencies to manage campaigns, set bidding parameters, and purchase inventory across multiple exchanges. DSPs typically serve larger advertisers. The DSPs let advertisers create and finetune advertising campaigns, then they route bids to different exchanges to accomplish the campaigns' objectives. Other ad-buying tools that serve small- and mid-sized publishers do more of the decision-making on behalf of the

advertiser. Google operates multiple buy-side tools, including Google Ads (a digital ad-buying platform primarily serving small and mid-sized advertisers) and DV360 (a full-service DSP serving larger advertisers and agencies). Together, these tools control significant advertiser spending and thus significant demand that publishers need to access.

47.    Ad-buying tools compete based on their ability to help advertisers spend their budgets and achieve the highest return on investment. Advertisers do not want their budgets to go unspent, but they also want to reach the right audiences at the right price. Ad-buying tools differentiate themselves by offering superior targeting capabilities, access to desirable inventory, and efficient bidding algorithms. In a competitive market, a DSP or ad network that consistently delivered poor results (e.g., showing ads to uninterested users or failing to acquire enough ads to spend an advertiser's budget) would lose advertiser business to rivals.

## II.    MARKET DEFINITION AND MONOPOLY POWER

### A.    Publisher Ad Servers for Open-Web Display Advertising

#### 1.    Market Definition

48.    Publisher ad servers for open-web display advertising constitute a distinct relevant product market for antitrust purposes.

49.    Publisher ad servers serve a distinct purpose. Publishers and MCMs like Mediavine use them to manage and monetize web ad inventory. Publisher ad servers offer several unique features not offered by other ad tech products, such as:

    a.    allocating ad impressions between direct and programmatic (indirect) sales channels;

    b.    placing ad exchange bids in competition with bids from header bidding (discussed below), programmatic direct sales, and other ad exchanges;

    c.    rendering an ad on a publisher's page for each impression;

14

    d.     billing for ads rendered; and

    e.     providing inventory and revenue analytics.

50.    Unlike other ad tech products, publisher ad servers use a variety of pricing models, including volume-based and flat fees. Ad exchanges and demand-side platforms charge percentage-based fees. Publisher ad servers, in contrast, charge a single price for each impression. They also cost far less than other ad tech tools. For large open-web publishers, ad server fees run about 1% to 2% of the revenue an impression generates. Ad exchanges charge double-digit percentage take rates.

51.    Participants in the ad tech industry, both customers and providers, recognize publisher ad servers as a distinct product. Their unique function, features, and pricing set them apart from other ad tech tools. Google has long treated its own publisher ad server, DFP, as a separate product. Google tracked DFP's market share in open-web display ad serving as a standalone category. Publishers and MCMs like Mediavine similarly treat publisher ad servers as distinct products that serve a different purpose than other ad tech tools and cannot substitute for them.

52.    Other ad tech products that are capable of serving display ads on open-web publishers' websites are not reasonably interchangeable with ad servers. For example, the publisher-facing side of an ad network is not a substitute for publisher ad servers for large publishers and MCMs such as Mediavine. Such ad networks cannot place several different demand sources in competition with each other for each impression, a process that is necessary to maximize revenue. Ad networks are instead limited to sourcing bids from advertisers who have also signed up to the buy-side of the network.

15

53.    Publishers also cannot substitute away from publisher ad servers by shifting to non-open-web advertising channels. Publisher ad servers for open-web display advertising constitute a distinct market because they perform ad-serving functions essential to websites. Websites are the core business of the news organizations, media companies, and other online publishers that Mediavine serves. A text-based news publisher cannot monetize its primary content with instream video ads or other non-display ads. Their text-based content exists on web pages and requires open-web display advertising to generate revenue.

54.    These publishers also cannot abandon their websites and publish revenue-generating content only through mobile apps or social media pages. Shifting users from websites to apps or social media is not feasible. Many web publishers depend on users finding their content through search engines or hyperlinks from other sites. Requiring users to download an app or follow a social media account to access content would eliminate a large share of their audience. Open-web display ads are therefore not reasonably interchangeable with social media, in-app, or instream video ads from the perspective of news, media, and online publishers. Publisher ad servers for those other channels cannot substitute for publisher ad servers that serve open-web display advertising.

55.    As a general matter, publishers also cannot build their own ad servers as a substitute. Developing an in-house publisher ad server is an extraordinarily complex undertaking that falls outside the core competencies of MCMs, news organizations and other online publishers. The investment required to build one is prohibitive for companies that do not specialize in enterprise software development. Even after building an in-house ad server, a publisher must commit substantial operational support, infrastructure, and capital to maintain it on a day-to-day basis and to evolve it continuously to keep pace with third-party alternatives.

16

56.     Almost no publishers have succeeded in developing and operating an in-house publisher ad server. The few that have done so are large digital technology companies. Even among that small group, most do not use their in-house ad servers for open-web display advertising. They instead use them to serve customized, site-specific ad formats like social media ads or sponsored listings. In-house ad servers are not a reasonable substitute for third-party publisher ad servers in the open-web display advertising market.

57.     The hypothetical monopolist test confirms that publisher ad servers constitute a distinct product market. The commercial realities of the publisher ad server market show that a monopolist could engage in anticompetitive conduct without losing significant customers. A hypothetical monopolist of publisher ad servers for open-web display advertising could raise prices or degrade quality without facing meaningful substitution because publishers lack close alternative products. Google's own conduct proves the point. As will be discussed below, Google degraded DFP's quality by restricting how publishers could work with rival ad exchanges. It gave its own exchange, AdX, structural advantages over competing exchanges through programs like First Look and Last Look. It removed features publishers relied on, such as variable price floors, when it imposed Unified Pricing Rules. Despite these quality reductions, DFP retained 99 of its top 100 publisher customers in the years that followed. Google's own internal analysis estimated it could increase net revenue by at least $40 million by raising DFP prices 20%. A hypothetical monopolist that could degrade quality and raise prices in these ways without losing customers would be operating in a distinct product market.

58.     The geographic scope of the publisher ad server market is worldwide, excluding countries that restrict access to the internet (e.g., China) or are subject to U.S. sanctions (e.g., Iran). The internet is a global network, and ad tech providers compete on that scale. The only

17

constraint on intercontinental ad serving is the speed of light. U.S. advertisers routinely target international internet users, and international advertisers target U.S. users, including through ads on U.S. publishers' web pages. Advertisers also bid to reach international users who visit U.S. publishers' sites, and American consumers access digital content from international publishers. Ad tech providers have built global infrastructure to match this reality. They manage, price, sell, and track performance of their products on a worldwide basis. Google charges consistent ad server fees across the globe. Google also tests and implements product and policy changes globally, including much of the conduct at issue in this case.

### 2.    Monopoly Power

59.    Google possesses monopoly power in the worldwide publisher ad server market for open-web display advertising. Google's publisher ad server, DFP, holds a dominant share of the market. That dominance is durable and protected by high barriers to entry and expansion. Google's own conduct confirms its monopoly power. Google also degraded DFP's features without concern that its publisher customers would switch to competing ad servers.

60.    In 2022, Google controlled approximately 91% of the worldwide publisher ad server market for open-web display advertising, measured by impressions served. From 2018 through 2022, Google's worldwide share remained between 91% and 93.5%. Its U.S. share stayed between 86.5% and 92.3%. Google's own internal estimates placed DFP's market share between 84% and 90% at various points over the past decade. Some internal documents described Google as holding a monopoly in publisher ad serving. Indeed, one DFP engineering manager suggested that losing some market share would carry the benefit of showing regulators that viable alternatives exist and that Google is not a monopoly.

61.    Google's monopoly power in the publisher ad server market is durable because of high barriers to entry and extreme switching costs. Building a publisher ad server is a complex,

18

resource-intensive process, even for a large corporation. Gaining customers is even harder. Publishers almost always use a single ad server for open-web display advertising because running two or more ad servers at once creates serious problems with forecasting, integration, and latency. To win market share from DFP, a rival must convince publishers to abandon DFP entirely and switch. That is extraordinarily difficult. Publisher ad servers are sticky products that require enormous effort to change. Indeed, a former Google and DoubleClick executive described switching publisher ad servers as a nightmare with the highest switching costs of any product.

62.     Even if publishers wanted to switch from DFP, they have almost nowhere to go. The lack of meaningful alternatives compounds the difficulty of switching. Several once-large rival ad servers have exited the business entirely, as OpenX did, or shifted to competing in channels other than open-web display advertising, as Kevel did. Even Meta abandoned its effort to build a publisher ad server because the barriers to gaining scale in a market Google dominates proved insurmountable.

63.     Google's conduct (discussed in detail below) confirms its monopoly power. Google degraded DFP features over publisher objections without fear of losing customers. For example, Google eliminated publishers' ability to set higher price floors on AdX through its Unified Pricing Rules update. Publishers opposed the change. Google did not factor the risk of publisher switching into its analysis of the update's impact. Publishers did not switch, even though competing ad servers still allowed variable price floors.

64.     Google has also recognized its ability to raise DFP prices. Internal estimates concluded that the market would bear a price increase. Google projected that raising DFP fees by

10% to 20% could produce a substantial positive impact on overall profitability. Google chose not to raise prices, but its ability to do so profitably is direct evidence of monopoly power.

### B.    Ad Exchanges for Open-Web Display Advertising

### 1.    Market Definition

65.    Ad exchanges for open-web display advertising also constitute a distinct relevant product market. The ad exchange is the only ad tech tool that allows publishers to auction their inventory at scale and in real time to the largest sources of programmatic advertising demand. Advertisers and their agencies use demand-side platforms like DV360 and The Trade Desk, or the advertiser-facing sides of ad networks like AdWords, to purchase open-web display advertising programmatically. These buying tools submit bids into ad exchanges. The exchanges run real-time auctions that rank demand sources and select winning bids to send to the publisher's ad server. Some advertising demand can bypass ad exchanges, including purchases through closed ad networks and direct-to-publisher campaigns, which are often executed using insertion orders. But the majority of programmatic ad spending flows through ad exchanges.

66.    The distinct nature of the ad exchange market is reflected in its pricing structure. Ad exchanges charge publishers a percentage of the winning bid on each impression. That model differs from publisher ad servers, which charge a volume-based or flat fee per impression, and from demand-side tools, which charge advertisers directly. Ad exchanges also charge far more than publisher ad servers (despite that both product categories have been monopolized by Google). Because ad exchanges perform the unique function of running real-time auctions to identify the highest advertiser bids, they command take rates between 10% and 20% of the revenue from each winning bid.

67.    Industry participants treat ad exchanges as a distinct product, separate from other ad tech tools. Google identifies ad exchanges as a product category distinct from publisher ad

servers, ad networks, and demand-side platforms. Publishers and MCMs like Mediavine share that view. So do third-party ad tech developers, including companies that specialize in building ad exchanges.

68.    Other ad tech tools are not reasonably interchangeable with ad exchanges. Ad networks also connect advertisers to publishers, but sophisticated publishers and MCMs such as Mediavine do not treat ad networks as substitutes. Ad networks offer publishers very limited control and cannot place bids from multiple demand sources into competition with each other. Ad exchanges perform that competitive auction function, and no other ad tech tool replicates it.

69.    Direct deals with advertisers are not reasonable substitutes for ad exchanges. Programmatic advertising offers distinct advantages that direct deals cannot replicate. As Google itself recognized in an internal document, a shift from programmatic advertising to direct deals would be highly unlikely, in part because of the effort required to establish and maintain direct connections.

70.    Ad exchanges and other products that facilitate the sale of only instream video, mobile app, or social media ads cannot help publishers monetize their open-web display inventory. A text-based publisher that does not host video content cannot use an ad exchange that runs auctions solely for instream video ads. Those ads function like television ads and run inside a website's video player. Nor can a publisher seeking to monetize traffic to its website use an ad exchange that runs auctions for in-app ads. They do not serve display ad slots on a web page. To monetize its display inventory, a publisher must use an ad exchange that facilitates the sale of open-web display ads. The only products reasonably interchangeable with such an exchange are other ad exchanges that also facilitate the sale of open-web display ads.

21

71.     The hypothetical monopolist test confirms that open-web display ad exchanges constitute a distinct product market. A monopolist of open-web display ad exchanges could charge supracompetitive prices without losing significant customers. Google's own internal analysis supports this conclusion. An internal study projected that a 25% decrease in AdX's price would have limited impact on its market share. That finding reveals significant customer stickiness and inelastic demand. Publishers and MCMs like Mediavine face particularly inelastic demand for ad exchanges because no alternative tool can place demand sources into competition with each other or maximize the monetization of web inventory. A monopolist in this market could charge supracompetitive prices without seeing customers switch to rival products in numbers sufficient to constrain pricing, as Google has done.

72.     As with publisher ad servers, the geographic market for ad exchanges is worldwide, excluding countries that restrict access to the internet (e.g., China) or are subject to U.S. sanctions (e.g., Iran). The same global dynamics apply. Ad tech providers compete across borders, advertisers and publishers transact internationally, and companies like Google price and implement product changes on a global basis.

### 2.     Monopoly Power

73.     Google possesses monopoly power in the ad exchange market for open-web display advertising. AdX has dominated this market for over a decade. Google has charged a durable supracompetitive take rate of 20% on each open-web display transaction. As the market matured and competing exchanges reduced their prices, Google refused to lower AdX's take rate. Despite the availability of cheaper alternatives, customers have not left AdX in meaningful numbers. Google's substantial market power in the ad exchange market explains this customer stickiness. High barriers to entry, driven by Google's scale and network effects across the open-

web display ecosystem, reinforce that power. Google has maintained a market share roughly nine times greater than its next-largest competitor.

74.    AdX's durable 20% take rate is direct evidence of Google's monopoly power in the open-web display ad exchange market. Google employees recognized that AdX charged significantly more than rival exchanges like Index Exchange, Magnite, and Xandr, which often charged closer to 10%. Google maintained AdX's 20% take rate profitably even as competitors reduced their prices further and the market became "commoditized." A Google product director admitted such commoditization was occurring as early as 2017, and other Google employees stated that AdX was no longer worth 20%: "20% for just sell-side platform/exchange isn't likely justified by value." Yet Google refused to lower its prices or even to negotiate AdX's take rate with nearly all of its customers. It offered minimal discounts to only a handful of the largest publishers.

75.    In addition to recognizing that AdX's pricing did not reflect its fair value, Google's employees acknowledged that the exchange's market dominance left publishers and advertisers with little choice but to continue using it. In 2014, an internal Google study projected that cutting AdX's take rate by 25% would have limited impact on customer retention. When the industry adopted header bidding to counter Google's dominance across the ad tech stack, Google considered reducing AdX's 20% take rate. But an internal study showed that a lower take rate would not win enough additional transactions to offset the lost profit. Google's sales team did not believe a reduction would help win deals. Google thus never reduced its overall 20% take rate. It continued to deny discount requests. AdX's customers did not leave, and AdX did not lose market share.

76.    A competing ad exchange confirmed this dynamic through its own experiments. Over several years, the competitor reduced its take rate, at one point setting it to zero, and found only a nominal effect on its win rate at best. The inability of competitors to constrain AdX's pricing is direct evidence of Google's monopoly power in the ad exchange market.

77.    Google has also used its market power in adjacent segments of the ad tech stack to prevent customers on both sides of the ad exchange market from switching to rivals. On the buy side, Google made AdX the only exchange with access to AdWords, which publishers valued as a large and unique source of advertising demand. Google maintained this exclusivity despite internal recognition that allowing AdWords to bid into other exchanges would benefit AdWords' advertiser customers. By restricting AdWords bidding to AdX, Google ensured that publishers would treat AdX as an exchange they could not afford to skip. The unique advertising demand flowing through AdWords helped Google maintain the power to charge AdX publishers a 20% take rate. Google's ability to manipulate auction dynamics and disregard the impact on its advertiser customers is further direct evidence of its monopoly power in the ad exchange market.

78.    On the sell side, Google's power in the ad exchange market and the publisher ad server market reinforced each other. As will be discussed further below, Google restricted AdX to send real-time bids only to DFP. This decision denied a valuable AdX feature to publishers using other ad servers and entrenched Google's monopoly in publisher ad serving. Google maintained this restriction despite requests from customers of competing ad servers to access AdX's real-time bids. The restriction compelled publishers to use DFP to obtain effective access to AdX and, through AdX, to the unique advertising demand from AdWords. Once DFP captured near-total market share, Google merged DFP and AdX into a single publisher-facing product known as GAM. That combination further intertwined the two products and deepened publisher lock-in.

Google's conduct on both the buy side and the sell side demonstrates that it set the terms of dealing with its customers without regard for competitors. This behavior cannot be explained absent monopoly power.

79.     Finally, AdX's high and durable market share confirms Google's monopoly power in the open-web display ad exchange market. From 2018 to 2022, AdX handled 63% to 71% of worldwide open-web display transactions among the ad exchanges that produced data in this litigation. Estimated against the total market, AdX handled between 54% and 65% of all transactions. That share remained stable over the entire period. AdX's market share was roughly nine times larger than that of its next-largest competitor, which held only 6% of the market.

## III.    GOOGLE'S EXCLUSIONARY CONDUCT

80.     Google's exclusionary conduct harmed competition in the publisher ad server and ad exchange markets not only by reducing the prices publishers received for impressions, but by foreclosing rivals from access to critical demand and inventory, denying rivals the scale necessary to compete effectively, raising barriers to entry and expansion, reducing incentives to invest and innovate, degrading transparency and product quality, and impairing publishers' ability to route inventory and demand through competitive alternatives. The challenged conduct was interdependent and mutually reinforcing: each practice made the others more effective and made it harder for publishers, advertisers, and rival ad tech firms to escape Google's control.

### A.      Google Ties AdX to AdWords

81.     In 2008, Google bought DoubleClick for $3.1 billion. Google pursued the deal to strengthen its ad-serving tools and to block Microsoft from acquiring the leading ad-serving platform, which Google viewed as a serious competitive threat to its publisher-side ad tech business.

82.     The DoubleClick deal put Google in control of DFP, the leading publisher ad server, and also gave Google an early-stage ad exchange, AdX, that could connect DFP publishers with advertisers. At the time of the acquisition, DFP held about a 60% share of the publisher ad-serving market and served nine of the ten largest U.S. websites.

83.     After buying DoubleClick, Google executed a multi-level tying scheme. The first step steered both advertisers and publishers toward using AdX. The second used AdX's resulting market power to lock publishers into using DFP.

84.     Google first tied AdX to AdWords demand: except in limited circumstances, Google allowed advertisers using AdWords to bid on publishers' inventory through AdX only.

85.     AdWords (now called Google Ads) is Google's primary tool for buying ads, and advertisers must use it to purchase Google search advertisements on Google's search engine. While it started as a search advertising platform, it became a key part of Google open-web display advertising business. AdWords aggregates millions of advertisers—especially small and mid-sized businesses—drawn to Google by the scale and reach of its search platform. Another court has already found that Google unlawfully maintained that search dominance through anticompetitive default distribution agreements. *United States v. Google*, 747 F. Supp. 3d 1, 117-18, 135-38 (D.D.C. 2024). One consequence was to make AdWords a necessary buying platform for millions of advertisers.

86.     The AdWords/AdX tie restricted competition in the ad exchange market. Ad exchanges are two-sided platforms that connect advertisers and publishers, and they are subject to strong network effects: advertiser demand draws in publisher inventory, and publisher inventory attracts more advertiser demand. By limiting AdWords demand—one of the largest and most valuable pools of digital advertising demand—to bidding through AdX, Google

26

undermined rival exchanges' ability to grow their own networks. That artificial shift made AdX effectively a "must-call" exchange for publishers, because publishers could not reach AdWords advertisers through any other exchange. The restriction also foreclosed rival exchanges from access to a critical mass of advertiser demand needed to compete for publisher inventory, achieve efficient scale, improve auction performance, and constrain AdX's take rates. As rival exchanges lost access to that demand, they became less attractive to publishers and advertisers alike, which further weakened their ability and incentive to invest in product quality, bidding technology, fraud controls, and publisher tools.

87.     Google thus implemented the AdWords/AdX tie despite the fact that it made no short-term economic sense for its AdWords advertisers. Google deliberately limited where AdWords advertisers could bid for open-web display inventory even though advertisers would have benefited from AdWords bidding across all exchanges. Internal discussions reflected that Google's buy-side personnel favored broad participation in auctions and resisted disadvantaging AdWords. Google nonetheless imposed the restriction to protect its sell-side businesses: keeping AdX attractive, preserving AdX margins, and reinforcing DFP's position by reducing publishers' incentives to switch to rival ad servers. When proposals arose to let AdWords bid on third-party exchanges, sell-side leadership rejected them because doing so would weaken AdX and, in turn, DFP's dominance. As Google employees themselves put it, Google "artificially handicap[ped] [its] buyside ([AdWords]) to boost the attractiveness of [its] sellside (AdX)." EDVA Liability Op., 778 F. Supp. 3d at 863.

88.     Google's restriction of AdWords demand to AdX also suppresses competition for publisher inventory across the open web. Advertisers using AdWords seek to reach audiences wherever they appear online, including the smaller publishers served through Mediavine's

Journey platform. In a competitive market, those advertisers would bid for that inventory through multiple exchanges in order to reach those audiences. By confining AdWords demand to AdX, however, Google prevents that demand from competing through rival exchanges. This restriction reduces the number of bids for impressions sold outside Google's stack and reinforces the advantage AdX derives from its integration with Google's ad server, DFP. It therefore reduces head-to-head exchange competition for those impressions, lowers clearing prices, deprives rival exchanges of transaction volume and data needed to improve their products, and makes entry and expansion by competing exchanges materially more difficult.

89. Google continues tying AdX to AdWords to this day. In 2016, Google did begin sending a small amount of retargeting demand to independent exchanges, but that expansion was so limited that it had no practical effect on competition. It did, however, confirm there was no technical obstacle to Google letting AdWords advertisers reach inventory on independent exchanges.

90. There are also no quality, fraud, malware, or performance justifications for Google's AdWords/AdX tie. Internal Google materials show that the AdWords team responsible for placing ads on high-quality sites without unacceptable latency or fraud risk supported buying across other major exchanges. They believed rival exchanges' spam and fraud rates were acceptable and comparable to AdX.

91. Lacking any procompetitive justification, the sole purpose of the AdWords/AdX tie was to grow AdX's market power and enable the next step of Google's multi-level tie, thereby weakening competing exchanges, reducing publisher choice over exchange partners, and impairing the competitive process by which exchanges would otherwise compete on price, quality, transparency, and innovation.

28

**B.      Google Ties DFP to AdX**

92.      Google's second tie consisted of tying DFP to AdX. Google did this by programming AdX to only return real-time bids to DFP. Real-time bids are critical for publishers because they allow each impression to be sold at its true market value through instantaneous, competitive auctions. Without real-time bids, publishers must rely on stale or estimated pricing that systematically undervalues their inventory. The AdX/DFP tie forced publishers to adopt DFP as the price of accessing AdX's real-time demand. Publishers could still list impressions on non-Google exchanges, but large publishers and MCMs like Mediavine also strongly valued the distinctive demand flowing from AdWords. AdWords represented a unique pool of advertiser spending that was unavailable through any other exchange. As a practical matter, publishers saw DFP as necessary because it was the only ad server that could access AdX's real-time bids and, through AdX, the unique demand from AdWords. The tie therefore foreclosed rival ad servers from offering publishers an equivalent product, denied those rivals the scale needed to compete effectively, and impaired competition in the publisher ad server market on price, features, transparency, and service.

93.      Like the AdWords/AdX tie, the AdX/DFP tie made no short-term economic sense apart from its effect on ad server competition. AdX would have benefited economically from submitting real-time bids through rival publisher ad servers and competing for more publisher inventory. Google nevertheless limited publishers' ability to access AdX demand if they licensed non-Google ad servers. It did so to reinforce DFP's dominance, not to improve AdX's performance. A Google employee put it succinctly: "AdX can serve as a tool to pull publishers onto [D]FP." EDVA Liability Op., 778 F. Supp. 3d at 861.

94.      There is no technical constraint that would cause an ad exchange to refuse to serve or degrade service for publishers simply because they use a rival ad server. AdX is the

29

exception. Other exchanges will bid in real time regardless of which ad server a publisher uses. And rival ad servers would readily accept AdX demand because it would allow publishers to pair that demand with a competing ad server product, increasing choice without requiring the ad server to build an exchange of AdX's scale.

95.    Nor is there any legitimate business rationale for tying ad server to an exchange. No other exchange conditions access to its demand on adoption of the exchange's preferred ad server. Google's decision to deny real-time AdX bidding to publishers using non-Google ad servers reflects the exercise of market power to steer adoption toward DFP, not any operational necessity. Indeed, Google employees admitted internally that bidding into non-DFP exchanges would require "[m]inimal effort," but doing so would have "[t]ake[n] away a key differentiator for DFP." EDVA Liability Op., 778 F. Supp. 3d at 828.

96.    Publishers recognized that the AdX/DFP tie left them little choice. As a general matter, it is not economically feasible for a publisher to use multiple ad servers. Open-web display publishers such as Mediavine thus understood that, even if they preferred another ad server, they effectively had to use DFP exclusively. That was their only option to obtain real-time access to AdWords demand through AdX. In practice, the tie compelled Mediavine and other publishers to take DFP even when they did not want it or would have chosen a different ad server on better terms.

97.    The AdX/DFP tie also suppresses competition for inventory sold outside Google's ad server ecosystem. Mediavine's Journey platform runs header-bidding auctions across multiple non-Google demand sources, including competing exchanges. Those exchanges are able to bid for Journey inventory in real time. AdX does not participate in those auctions because Google restricts AdX to submitting real-time bids only through DFP. In a competitive market, AdX

30

would bid for that inventory just as other exchanges do. Advertisers using AdX—including many smaller advertisers using Google's buying tools—seek to reach audiences across the open web, including the smaller publishers served through Journey. But limiting AdX's real-time bidding to publishers using DFP, Google prevents that demand from competing for those impressions. This restriction reduces the number of bids for ad inventory, including the inventory of the smaller publishers on the Journey platform, and lowers clearing prices, thereby suppressing competition in the ad exchange market and reinforcing the dominance of Google's integrated ad tech stack.

98.    By tying AdWords, AdX, and DFP together, Google reinforced and expanded its dominance in the publisher ad server market. Competitors exited, and DFP retained market share above 90% from 2018 through present. The tie also raised barriers to entry and expansion because any rival ad server had to persuade publishers to forgo real-time access to AdX and the unique demand tied to it, a sacrifice that materially reduced the rival's ability to win customers even if it offered a better product or lower price.

**C.    First Look**

99.    Google used its monopoly power in publisher ad servers and ad exchanges to roll out policies and technical changes to both its sell-side and buy-side ad tech products that did not serve customers' interests. Those changes reduced product quality and further entrenched Google's control over open-web display advertising and monopolies in the relevant markets. Google implemented them even in the face of publisher complaints because its durable market power insulated it from competitive pressure.

100.    Google's first major policy after imposing the AdWords, AdX, and DFP ties was "First Look," also referred to as "Dynamic Allocation."

101.    Under First Look, a publisher using DFP had to give AdX the first chance to buy each impression before any rival exchange could compete for it. DFP also gave AdX a structural

31

advantage by allowing AdX to bid in real time, while other exchanges had to rely on static bids set in advance that could not reflect the value of the particular impression at the moment of sale.

102.   The combination of the AdX/DFP tie and First Look meant that (1) AdX was submitting real-time bids exclusively to DFP customers and (2) DFP would evaluate those bids first and not solicit real-time bids from other exchanges unless AdX chose not to exceed their static bid. The result was that AdX won publishers' highest value impression at a steep discount even when rival exchanges were willing to pay more. That dynamic reduced the frequency with which rival exchanges could win premium impressions, deprived them of transaction volume and reputation benefits associated with winning those impressions, and weakened their ability to attract publisher inventory and advertiser demand going forward.

103.   As a result of First Look, AdX effectively received a priority position on DFP inventory even when the publisher wanted to give a competing exchange the first opportunity. "The 'unfair advantage' that First Look offered Google was built into the software that controlled the auction logic within DFP, and publishers could not toggle it off." EDVA Liability Op., 778 F. Supp. 3d at 827.

104.   Google portrayed the feature as publisher-friendly because it let AdX submit real-time bids. Google represented to publishers, including Mediavine, that First Look "maximizes revenue." The reality was that First Look intensified the competitive harm from the AdWords/AdX/DFP ties by hardwiring a preference for AdX into DFP's auction decision rules. This built-in preference for AdX reduced publisher revenue, diverted impressions away from higher-paying exchanges, strengthened AdX's market power, and weakened competition among ad exchanges. It also insulated AdX from ordinary head-to-head price competition and reduced

rivals' incentives to invest in exchange technology because superior bids and features could still be defeated by Google's privileged position inside DFP.

105.    Google could not have imposed First Look without monopoly power in the publisher ad server market. In a competitive ad server market, publishers would have switched to a rival ad server that did not hardwire a preference for a single exchange. A firm facing real competitive pressure would have risked losing customers by degrading auction fairness. But Google imposed First Look because it knew publishers had no viable alternative to DFP. First Look therefore harmed competition not only by lowering prices for impressions, but by reducing auction quality, diminishing publisher choice, and preventing rival exchanges from competing on a level playing field for publisher inventory.

## D.    Header Bidding

106.    By early 2014, AdX had become the leading ad exchange and was winning a majority of the inventory that DFP sent to auction. As Google's share grew, publishers and other industry participants became increasingly concerned about Google's dominance and began looking for ways to offset the advantage First Look gave AdX.

107.    Non-Google industry participants and open-source advocates developed header bidding, a tool that let publishers using DFP request real-time bids from multiple exchanges at once, and formed Prebid, a non-profit organization that created open-source header bidding solutions for publishers. With header bidding, a publisher adds code to the header of its webpage that requests bids from multiple exchanges and runs an auction outside Google's systems. The publisher then typically sends the winning header bid into DFP as a floor price that AdX must beat to win the impression.

108.    In a competitive market, publishers would not have needed header bidding. It is a workaround that represented their only option to enable independent exchanges to compete in

33

real time on equal terms with AdX. Header bidding was only necessary because DFP's rules prevented that level playing field.

109.    Header bidding spread quickly and was widely adopted by large publishers by 2015, including Mediavine. By forcing ad exchanges to compete directly for the same impressions, it materially increased publisher revenue. Google knew this: "pitting multiple exchanges against one another fostered price competition, which was good for [publishers'] business." Google's own analyses showed increasing exchanges' head-to-head competition increased publishers' revenue by 40%. Header bidding also reduced Google's ability to insulate AdX from competition, gave rival exchanges a path to scale, and threatened to restore competition on price, quality, and innovation in the ad exchange market.

110.    Google employees immediately viewed header bidding as an "existential threat" because it undermined AdX's revenue model, which depended on privileged access to publisher inventory through DFP. EDVA Liability Op., 778 F. Supp. 3d at 830. Internally, Google acknowledged that header bidding increased publisher yield and gave publishers a strong incentive to adopt it. In Google's own words, header bidding "gives many publishers better yield, so it's a no-brainer for a publisher to adopt it." EDVA Liability Op., 778 F. Supp. 3d at 828. Google first responded by keeping AdX out of header bidding auctions, which avoided direct head-to-head competition with rival exchanges. When that did not blunt adoption, Google rolled out additional product features and policy changes intended to counter header bidding's growing impact. Those responses were designed to deny rival exchanges the scale and competitive momentum header bidding otherwise would have generated and to preserve AdX's dominance despite a market development that was improving outcomes for publishers.

34

### E.    Last Look

111.    Google also responded to header bidding by introducing a feature called "Last Look" into DFP. Google introduced Last Look in 2014, kept it in place for years, and then replaced it in 2019 with different technical mechanisms that served the same practical function.

112.    Last Look allowed AdX to beat the header bidding winner inside DFP on essentially every impression. To put the header-bidding result into DFP, publishers had to enter the winning header bid as a price floor. AdX then received that floor and, unlike rival exchanges, had a unique chance to revise its bid in response to the highest competing bid.

113.    Being able to view its competitors' bids gave AdX an unmatchable informational advantage that materially disadvantaged rival exchanges. Google itself described Last Look as "inherently unfair." In a competitive auction, each bidder must submit its best bid without knowing what it needs to beat. Last Look eliminated that uncertainty for AdX. AdX could see the highest competing price and then decide whether to clear it by the smallest possible increment. This reduced the need for AdX to bid based on the true value its advertisers placed on an impression. Because rival exchanges could not counter that informational asymmetry, Last Look systematically transferred wins from rivals to AdX even when rivals had generated the competitive pressure that should have determined the auction outcome.

114.    Google has argued that Last Look was not coercive because publishers using header bidding could opt out of requesting bids from AdX. But given AdX's market power, that was a Hobson's choice. For large publishers and MCMs like Mediavine, it was not financially viable to forgo AdX because doing so meant losing access to the distinctive advertising demand that flows through AdWords.

115.    Last Look harmed competition in the ad exchange market by undermining the very mechanism through which rival exchanges could win impressions. In a functioning market, exchanges compete by offering the highest bid.

116.    Last Look broke that dynamic by giving AdX the ability to observe and beat any competing bid by the smallest possible margin. Rival exchanges could never win on price because AdX always had the last move. This discouraged investment in competing exchanges and reduced their ability to attract advertiser demand. Exchanges that cannot win high-value impressions cannot demonstrate value to publishers or advertisers, which erodes their ability to grow and compete. Last Look thus reinforced AdX's dominance not through superior performance but through a structural advantage that Google embedded in its own ad server software. The result was a self-reinforcing cycle: AdX's privileged position inside DFP attracted more demand, which made AdX harder for publishers to drop, which gave Google even less reason to compete on price or quality. That cycle raised barriers to entry and expansion for rival exchanges and reduced competitive pressure on Google to improve auction design, lower take rates, or provide greater transparency.

117.    Eventually, Google would respond to scrutiny of Last Look by claiming to end the practice in 2019. By then, however, Google had replaced Last Look with new auction rules that replicated the effect and preserved the same anticompetitive harm to the competitive process.

F.    **Enhanced Dynamic Allocation**

118.    Another early Google response to header bidding was "Enhanced Dynamic Allocation." Before Google introduced it, publishers using DFP could prioritize direct-sold campaigns so those advertisers received first access to premium impressions, with remaining inventory then offered through exchanges. Publishers could also choose, on their own terms, whether and how to let an exchange compete against direct-sold demand. In either configuration,

36

publishers retained control over allocation decisions and could protect negotiated direct relationships that often depended on access to high-value inventory.

119.    Beginning in 2014, Enhanced Dynamic Allocation stripped publishers of the ability to decide when and how to expose impressions to AdX. Under this approach, Google required publishers to make each impression available to AdX. DFP would translate a publisher's direct-sold campaign into a "temporary" CPM and send that figure to AdX as a price floor. AdX could then displace the publisher's direct deal by bidding only a penny more than the temporary CPM. In setting that temporary CPM, the system did not track the actual price the direct advertiser was willing to pay, so the temporary CPM could be far below the negotiated value. Google applied this process impression by impression, recalculating the temporary CPM each time, which repeatedly pushed down clearing prices for large volumes of high-value inventory. By converting premium direct-sold opportunities into impressions that AdX could capture on Google-controlled terms, Enhanced Dynamic Allocation also shifted transaction volume toward AdX and away from competitive channels through which publishers otherwise could have sold or routed that inventory.

120.    Google later exacerbated the effect of Enhanced Dynamic Allocation through "Optimized Competition," an add-on that uses an algorithm to lower the temporary CPM even further before DFP sends it to AdX as the floor.

121.    Enhanced Dynamic Allocation strengthened Google's grip on the exchange market by removing publisher autonomy over how premium inventory gets exposed to exchange competition. Publishers lost the ability to decide whether exchange bidding would compete with direct-sold campaigns and, if so, on what negotiated conditions. That matters because publishers often can and do strike exchange-side arrangements that advance their goals, such as minimum

price protections, volume commitments, or other bespoke terms. Enhanced Dynamic Allocation replaced that flexible, negotiated approach with a mandatory path through AdX under Google's uniform rules. That loss of publisher control impeded competition among exchanges because rival exchanges could no longer compete to offer publishers superior terms, transparency, or customization for premium inventory.

122.    For a long period, Google also limited this form of competition to AdX alone for impressions tied to direct deals. That arrangement gave AdX privileged access to high-value impressions and prevented other exchanges from offering publishers differentiated terms in exchange for access to that inventory. The practical effect was to channel premium opportunities to AdX by design, rather than requiring AdX to earn that business through better pricing, product features, or contractual terms. This denied rival exchanges an important source of scale and learning, especially in high-value impressions where performance and reputation matter most, and thereby weakened an important avenue by which they could have grown into more effective competitive constraints on AdX. That degradation of the direct-sales channel also harmed competition by corrupting a separate path through which publishers could monetize inventory outside Google's exchange, thereby increasing publisher dependence on AdX and reducing competitive pressure from alternatives to exchange intermediation.

123.    Because Google required publishers to route every impression through AdX, the system could siphon off the highest-value impressions for exchange buying and leave direct-sold campaigns with the leftovers. As that pattern repeated, it weakened publishers' direct sales channel and steadily pulled down the prices publishers could command for inventory that historically generated their strongest returns.

38

124.    Google does not disclose how DFP sets the "temporary" CPM it uses as the floor for AdX, or how the Optimized Competition algorithm modifies that number. Publishers therefore cannot audit the process or determine whether the temporary CPM accurately reflects the value of a given direct deal for a specific impression. This lack of transparency allows AdX to take impressions even when a direct-sold campaign likely would have paid more, including over the publisher's objection.

125.    Publishers repeatedly asked Google for the information needed to evaluate whether Enhanced Dynamic Allocation helped or hurt them, and Google declined to provide it. By 2016, Google's own program managers recognized that publisher concerns about Enhanced Dynamic Allocation came up regularly in client meetings, and publishers specifically requested improved reporting that would show how the feature affected outcomes and revenue. Google did not deliver that transparency. Even today, Google has not provided Mediavine with reporting or analytics that would allow it to track how AdX competes against its programmatic ad campaigns under Enhanced Dynamic Allocation.

126.    Publishers cannot realistically turn off Enhanced Dynamic Allocation. Beginning around 2015, Google made the feature effectively mandatory within DFP. If a publisher does not use it, AdX will not provide live, competitive bids on that publisher's impressions. Google also does not provide a clear, practical control in DFP's interface to disable the feature. As a result, publishers must accept this mechanism each time it sells inventory, even though it depresses the prices for high-value impressions.

127.    Enhanced Dynamic Allocation harmed competition in the ad exchange market by channeling premium inventory to AdX through mandatory rules rather than competitive merit. Rival exchanges lost the opportunity to compete for premium inventory on differentiated terms.

At the same time, the opacity of Google's temporary CPM calculations prevented publishers from detecting when AdX captured impressions at prices below what other exchanges or direct-sold campaigns would have paid. No exchange could overcome those advantages because no exchange could replicate AdX's mandatory, privileged access to DFP inventory. The program therefore foreclosed rival exchanges from an important class of transactions, reduced head-to-head competition for premium impressions, weakened rivals' ability to achieve efficient scale, and impaired competition on price, transparency, and innovation.

### G.    Bernanke and Alchemist

128.    Google ran another series of auction-manipulation programs alongside Last Look that relied on AdX's privileged visibility into rival bids. In 2013, Google rolled out "Project Bernanke," which boosted AdX's win rates against competing exchanges and shifted value from publishers to Google by changing the way AdX priced and cleared a large number of transactions. Google then used the incremental margin it extracted from those transactions to fund aggressive bidding in other auctions, including auctions where AdX otherwise would have lost to a rival exchange.

129.    When AdX later transitioned to first-price auctions in 2019, Google modified the same basic approach through a new algorithm sometimes referred to as "Alchemist," allowing the strategy to persist. Google did not disclose these mechanisms to publishers for years. Google's own internal work indicated that the program could reduce publisher revenue by as much as roughly 40% in certain circumstances, while generating hundreds of millions of dollars in additional profit for Google.

130.    Before AdWords, Google's buy-side tool, submitted a bid for an impression, it would run its own programmatic second-price auction. That auction determined what the

highest-bidding AdWords advertiser would ultimately pay if it won an impression (i.e., the amount bid by the runner up in the AdWords auction).

131. Prior to 2013, AdWords would also use those bids to determine the bids it would ultimately pass to AdX. AdWords would submit the top two bids, less a revenue share, into AdX.

132. Under the Bernanke scheme, Google began manipulating the bids AdWords would submit into AdX. Google would inflate the top bid significantly while simultaneously deflating the second-place bid or withholding it entirely.

133. In many circumstances, Google's scheme allowed it to extract additional revenue from publishers like Mediavine, for example, by lowering the second-place bid. Lowering it meant lowering the price AdWords ultimately had to pay the publisher for the impression. But Google still charged the winning AdWords advertiser based on the second price in the original AdWords auction. So Google could inflate the spread between the price it paid publishers and the price it charged advertisers, reaping extra profits at publishers' expense.

134. Google steered its excess profits into a "pool." It used that pool as a fund to offset losses that would occur in scenarios where Bernanke resulted in Google losing money on an impression. That would happen when the top independent exchange bid in DFP exceeded the highest AdWords bid. In that scenario, Google, after increasing the highest AdWords bid to win the impression, could end up paying more for an impression than it collected from the AdWords advertiser, resulting in a loss to Google. But Google was happy to incur those losses because the Bernanke scheme ensured AdX would gain market share and maintain monopoly power. Google could ultimately recoup these losses both from the impressions on which Bernanke was allowing Google to extract revenue from publishers and from the other ways AdX was taking monopoly profits. This strategy allowed AdX to win impressions it could not have won through ordinary

41

competition and shifted scale away from rival exchanges even where those rivals had generated the superior market bid.

135. While the scenario where Bernanke forced Google to take a loss on an impression meant AdX was increasing its bid for an impression, there was no corresponding benefit to the publisher. AdX could use Last Look to ensure it was only beating the top independent exchange's bid by a penny. So there was no material change to price the publisher would get, only to which exchange was paying it.

136. Google employed the Bernanke scheme from 2013 through late 2019, modifying it over time to increase its efficacy at (1) extracting revenue from publishers and (2) solidifying AdX's monopoly power. For example, in 2016, Google modified Bernanke to respond to an emerging practice whereby publishers solicited multiple bids from AdX. The publishers did so in the hopes of forcing AdX to submit more competitive bids reflecting the true value of an impression. Google responded with "Bell v.2," a modification to Bernanke that artificially depressed bids to publishers submitting multiple calls to AdX.

137. Bernanke did not end when AdX shifted to first-price auctions in 2019. In a first-price format, the winner pays its own bid, so simply submitting multiple Google Ads bids would not depress the clearing price in the same way. Google created a new mechanism designed for the first-price environment, which it referred to internally as "first-price Bernanke" or "Alchemist," and it remains in use.

138. Alchemist preserves the same economic playbook. It systematically reduces what publishers receive across a massive volume of transactions, generating an internal surplus, and then uses that surplus to subsidize AdX bids in select auctions to defeat rival exchanges offering higher CPMs. Like Bernanke, it depends on bid-level visibility and other competitively sensitive

information that Google can obtain through its control of key publisher-side infrastructure, allowing Google to influence auction results in ways that competitors and publishers cannot replicate or audit. By recycling value extracted from publishers into selective bid subsidies, Alchemist distorts the competitive process, denies rivals wins they would otherwise secure, and preserves AdX's scale and network advantages.

139.    Bernanke and its variants are rational only as exclusionary conduct. Google uses the Bernanke pool to subsidize AdX bids in auctions it would otherwise lose, even taking losses to deny wins to rival exchanges, and then replenishes the pool by suppressing publisher payouts in later auctions using inside bid information.

140.    Google also implemented a third version of Bernanke called Bell. Bell changed how Google allocated funds from the pool of money Bernanke accumulated from publishers. Bell used Google Global Publisher Tags to determine in advance whether a publisher gave AdX preferential access to its inventory. If a publisher did not grant AdX that preference, Bell switched its auctions to third-price auctions, which reduced the publisher's revenue from AdX. Bell then redirected Bernanke funds to inflate bids on inventory from publishers that did grant AdX preferential access. Bell harmed competition in the ad server market by punishing publishers that refused to favor AdX. Google used its control over DFP's auction mechanics to manipulate bids on non-compliant publishers' impressions and redirect the resulting surplus to reward publishers that gave AdX privileged treatment. This coercive mechanism leveraged Google's power in the ad server market to entrench AdX's dominance in the exchange market.

141.    Google's auction conduct was also deceptive. From 2010 to 2019, Google repeatedly stated that AdX operated as a sealed-bid, second-price auction, including public statements by senior executives and a 2014 academic publication. Bernanke undercut those

43

assurances in practice. By suppressing or removing the second-highest bid before it reached AdX, Google often pushed clearing prices toward the next-best alternative, so publishers received less than a genuine second-price auction would have produced. After 2019, Google moved AdX to a first-price format and marketed that change as "fair" and "transparent." Yet Google secretly implemented Alchemist. As described above, Alchemist manipulated the bids entering AdX so that the auction outcomes still favored Google, to the detriment of publishers and rival exchanges.

142.   Publishers like Mediavine could not reasonably detect the bid rigging because Google concealed it. Google did not disclose Bernanke or its successors, barred employees from discussing it with publishers, and internally treated it as top secret. One Google employee described the secrecy this way: "the first rule of Bernanke is we don't talk about Bernanke." Google also rolled it out gradually to reduce the risk of detection and withheld auction-level information that could have revealed manipulated Google Ads bids.

143.   For years, Google internally acknowledged that it was not being candid with publishers about how AdX auctions actually worked. Employees discussed the risk that providing certain reporting would allow customers to infer that AdX was not operating as a true second-price auction. Even in 2019, Google continued to publicly describe AdX as a second-price auction while simultaneously using mechanisms such as Last Look, Bernanke, and related variants that materially altered auction outcomes. Internal communications likewise reflect concerns about Google's deception and the harm to the market.

144.   If Google had disclosed Bernanke and related bid manipulations, Mediavine would have objected and pursued countermeasures to mitigate the revenue harm. Instead,

Mediavine reasonably relied on Google's repeated representations that AdX auctions were fair and second-price.

145.    Bernanke and its successors harmed competition in the ad exchange market by allowing AdX to win auctions it would have lost on the merits. Google used the Bernanke "pool" to win high-value impressions even when rival exchanges had submitted a higher bid, by inflating the AdX bid at the cost of Google's own revenue. In a competitive market, an exchange that systematically underpaid publishers to fund predatory bidding against rivals would lose customers to exchanges offering transparent, higher-paying auctions. Google could sustain this strategy only because its monopoly power in both the ad server and ad exchange markets left publishers with no practical alternative. Publishers could not detect the manipulation because Google controlled the auction infrastructure and concealed the scheme. Rival exchanges could not overcome it because Google used inside bid information unavailable to any competitor. The result was an exchange market in which AdX maintained dominance not by competing on price or quality but by rigging the auctions it ran through its own ad server. The scheme also reduced rivals' ability to attract advertiser demand and publisher inventory by depriving them of wins, transaction volume, and the reputational benefits of superior auction performance, thereby raising barriers to expansion and entry.

### H.    Dynamic Revenue Sharing

146.    The same year it introduced Last Look, 2014, Google also introduced dynamic revenue sharing ("DRS"), a pricing approach that further amplified AdX's advantage within DFP.

147.    Under DRS, AdX varied its fee from impression to impression to capitalize on Last Look. While AdX maintained an average take rate of roughly 20%, it reduced its fee on impressions where header bidding produced strong competitive offers, making it easier for AdX

to win. AdX then offset those discounts by charging more than 20% on impressions where competing exchange pressure was weaker.

148.    By cutting its fee only on impressions where competition was strongest, AdX increased the net revenue it offered publishers on those specific impressions and improved its odds of winning, since publishers rank bids on an after-fee basis. That shifted wins away from advertisers bidding through third-party exchanges, including exchanges participating in header bidding. Rivals could not respond in kind because they lacked Last Look's visibility into competing bids and therefore lacked the information required to adjust their fees in response to competing bids. According to Google, DRS was "just yet another way for AdX to exploit the last look advantage": in other words, "AdX gets to pay high and win whenever AppNexus [another ad exchange] is present with a high CPM, and can pay low when AppNexus bids low. AppNexus in contrast can't reliably save money on queries where AdX bids low, because it doesn't know AdX bids." EDVA Liability Op., 778 F. Supp. 3d at 870. This asymmetry allowed AdX to target competition only when necessary to defeat rivals, which is precisely the kind of exclusionary conduct that can deprive rivals of scale while preserving supracompetitive pricing elsewhere.

149.    Overall, this did not increase publishers' total revenue. It primarily reallocated wins toward AdX by discounting only when necessary and only enough to beat rivals, while recouping the discounts by charging higher fees on less competitive impressions. The net effect was to deprive rival exchanges of scale and revenue, further entrench AdX's market power, and reduce publishers' ability to diversify revenue sources away from Google. That loss of scale impaired rivals' ability to improve exchange quality, attract demand, and constrain AdX's terms, thereby harming the competitive process beyond any individual transaction.

46

150.    DRS and Last Look worked together to blunt the competitive pressure header bidding was designed to create. Last Look neutralized that threat by giving AdX visibility into rivals' best bids and a final chance to beat them by a minimal increment. DRS added a pricing lever that let AdX selectively discount its fee only when necessary to win those competitive impressions, then recoup the discount elsewhere. Together, these mechanisms preserved AdX's scale, reduced the ability of rival exchanges to gain share through header bidding, and helped AdX maintain its position as the dominant global ad exchange.

151.    Google initially kept the implementation and impact of DRS secret from publishers, including Mediavine. Even today, Google continues to mislead publishers when stating DRS was paused in 2019, when in fact Google's own materials indicate the strategy continued at least in some form thereafter.

## I.    Exchange Bidding

152.    In 2018, Google introduced a server-side header-bidding substitute called Exchange Bidding, later rebranded as Open Bidding. The product lets a limited set of non-Google exchanges, and sometimes DSPs, submit real-time bids alongside AdX. Google imposed an added publisher fee for using this path, charging 10% on video impressions and 5% on other formats. Those charges apply on top of whatever fee the participating non-Google exchange already takes, while Google does not impose a comparable extra charge when the impression clears through AdX. Those added charges made Exchange Bidding a structurally unequal contest and reduced the ability of rival exchanges to compete on price for publisher inventory.

153.    Exchange Bidding does not allow publishers to set up neutral, exchange-to-exchange competition. Using it requires the publisher to include AdX on every eligible impression, with no option to route an impression only to third-party exchanges. At the same time, the 5% or 10% publisher-side fee on non-Google participants gives AdX an inherent 5–

47

10% cost advantage, meaning a rival exchange must beat AdX by more than that margin to win. This design reduced the competitive significance of non-Google participation, preserved AdX's scale, and weakened what otherwise could have been a meaningful competitive alternative to Google-controlled auctioning.

154.    Google pushed publishers to shift away from client-side header bidding and onto Exchange Bidding. Google promoted Exchange Bidding as reducing latency and improving auction performance. Mediavine relied on those claims and ran Exchange Bidding for years.

155.    Internally, Google treated the latency narrative as a messaging strategy aimed at steering publishers off client-side header bidding. Google employees acknowledged that publishers were earning more through header bidding with only modest latency costs, and they warned colleagues to be careful in what they told publishers because weakening header bidding was an intended Google objective. Despite that internal understanding, Google continued promoting Exchange Bidding as the higher revenue option to induce publishers, including Mediavine, to move away from header bidding.

156.    Google's claim that Exchange Bidding would increase publisher revenue was untrue. Publishers generally earn higher prices when exchanges compete through other header-bidding paths, including client-side header bidding. Google nevertheless used pressure tactics and misleading messaging to steer publishers away from those alternatives and to obscure the revenue impact. That strategy insulated AdX from meaningful competition and caused substantial financial harm to publishers, including Mediavine. It also reduced the scale and effectiveness of header bidding as a market-wide competitive constraint on AdX and thereby harmed competition in the ad exchange market.

### J.    Minimum Bid to Win

157.    Google told publishers that, within Exchange Bidding, AdX no longer had any Last Look-type advantage. But in 2019 Google implemented a new mechanism that recreated a similar informational edge, with comparable effects on competition and publisher revenue.

158.    In fall 2019, Google rolled out what it called a "Unified Auction." Google said AdX would operate on a first-price basis and promised that bidders would not receive competitors' bid information. Google marketed the change as a "fair" and "transparent" marketplace and represented that bids would not be disclosed to other buyers before the auction concluded. Google's contracts also continued to state that Google would not use non-public publisher-provided data to inform its bids.

159.    At the same time, Google added a feature called "Minimum Bid to Win." After the auction, DFP tells the winning participant, if it is an "Authorized Bidder" such as an exchange or DSP bidding through AdX or Exchange Bidding, the lowest bid that would have still secured the impression. That figure is effectively the runner-up price, not simply the price that cleared. By revealing the threshold needed to win, the feature gives the winner the same practical insight Last Look provided: the next-highest price it needed to beat.

160.    The only meaningful difference between Minimum Bid to Win and Last Look is timing. Last Look revealed the price to beat before the auction closed; Minimum Bid to Win reveals the price to beat immediately after. At Google's scale, that timing difference is largely illusory. Across billions of similar auctions, Google can use the post-auction "price to beat" data to calibrate its bidding algorithms and predict rivals' bids in real time, achieving the same practical advantage. Google feeds Minimum Bid to Win data into its bidding systems and uses it to tune bids across large volumes of similar impressions. In practice, it supports algorithms designed to keep AdX bids as close as possible to the level needed to beat rival exchanges, which

49

replicates Last Look's core effect. Google's own planning materials described the objective as bidding just above a competitor's price and using prediction to approximate that result when the competitor's bid is not known in advance. Because the predictive power improves with scale, the program also compounds Google's preexisting dominance: the more auctions Google intermediates through DFP and AdX, the better it can forecast rival bids and the harder it becomes for rivals to compete on equal terms.

161. Google later added features that enhanced the value of Minimum Bid to Win by expanding the bid information available inside DFP. Around 2022, Google introduced "Header Bidding Trafficking," which allows DFP to ingest the full set of header-bidding bids, rather than seeing only the single top header-bidding bid that was previously passed into the ad server. By combining that richer bid-level dataset with Minimum Bid to Win feedback, Google can more precisely model rival exchange bidding behavior and tune AdX bids to clear just above competitors on future impressions.

162. Google also benefits from its unique access to other competitively sensitive data that supports bid-prediction. Because DFP sits at the publisher ad server layer, it can observe how rival exchanges participate across inventory types, placements, and timing patterns, along with other features that reveal their bidding behavior. Google can collect this information only because it controls the dominant ad server. It then uses those insights within its own exchange and buying tools, including Google Ads, to forecast rivals' bids and tune Google's bids accordingly.

163. Google could not replicate these informational advantages in a competitive market where it lacked control over the publisher ad server layer. The key input for Minimum Bid to Win, and related bid-calibration strategies, is granular, impression-level auction data

generated inside the ad server and shared selectively with favored demand participants. Absent monopoly power over the dominant publisher ad server, Google would not sit in the middle of the auction workflow, would not have exclusive access to cross-exchange bid information at scale, and could not dictate which bidders receive post-auction "price to beat" signals. Likewise, without monopoly power in the exchange layer, Google could not reliably convert that data advantage into higher win rates and durable take rates because publishers and buyers could route around it. The strategy depends on vertical control of both layers, not superior bidding skill. That dependence on vertical control is itself part of the competitive harm: Google's market power over critical infrastructure lets it create and exploit an informational advantage that no rival exchange could lawfully or practically obtain.

164.    Google kept this and other anticompetitive conduct from publishers. Google has represented to publishers, including Mediavine, in its terms of service that it would not use publisher-provided data to inform bids made through its buying tools, stating: "Google will not use data entered by Company into the Google Ad Manager user interface … for purposes of informing bids made on behalf of Google's AdWords service or the DoubleClick Bid Manager service … unless Company authorizes such use."[4]

165.    Minimum Bid to Win harmed competition in the ad exchange market by replicating the core effect of Last Look under the guise of a fair, first-price auction. Rival exchanges believed they were competing on equal terms after Google announced its Unified Auction. In reality, Google used post-auction bid data fed back through DFP to calibrate AdX's bidding algorithms across billions of impressions, allowing AdX to predict and narrowly beat competing bids on future transactions. No rival exchange could access this data because no rival

---

[4] Google Ad Manager, *Service Specific Terms – Google Ad Manager Service*, at
https://www.google.com/intl/en_us/google-ad-manager/publishers/sst/terms/.

controlled the publisher ad server layer where auction results are generated and distributed. Google compounded the advantage by ingesting full header-bidding bid sets through Header Bidding Trafficking, giving it an even richer picture of competitor behavior. The result was the same as Last Look: AdX won impressions not by bidding the highest value but by bidding the minimum amount needed to beat the next-best exchange. This suppressed rival exchanges' win rates, discouraged entry and investment in competing exchanges, and allowed Google to maintain supercompetitive take rates. In a competitive market without Google's vertical control over both the ad server and exchange layers, no single participant could have obtained or exploited this informational advantage. The program therefore impaired competition on the merits and entrenched AdX's dominance by turning Google's control of infrastructure and data into a self-reinforcing barrier to competition.

### K.    Poirot

166.    In 2017, Google embarked on another secret campaign to protect AdX's dominance, internally codenamed "Project Poirot," which deliberately reduced bids coming from Google's own DSP (Display & Video 360 or "DV360," formerly DoubleClick Bid Manager or "DBM") for impressions arriving through rival exchanges.

167.    DV360 is an advertiser-facing tool used by sophisticated brands and agencies to buy digital ad inventory across the open web. It is one of the largest DSPs in the market and serves as a critical gateway to billions of dollars in programmatic advertising demand. For publishers and ad exchanges, access to DV360 demand is essential: it brings high-quality campaigns, large budgets, and consistent bid volume. Before Google rolled out Project Poirot, independent exchanges typically received a significant share of their demand from DV360. After Poirot took effect, that DV360-sourced share fell materially, with independent exchanges losing a meaningful portion of that spend as it was diverted away from them. That diversion weakened

the competitive position of rival exchanges not just in isolated auctions, but across the broader market by reducing their scale, liquidity, and attractiveness to both publishers and advertisers.

168.    Project Poirot grew out of internal discussions about how to slow the rise of rival exchanges as header bidding spread. Google initially explored pulling DV360 out of bidding on header-bidding inventory outside AdX but concluded it could not implement that technically. It instead directed DV360 to systematically bid lower on impressions sold through exchanges that supported header bidding.

169.    Google has portrayed Poirot as "bid shading," a technique used in first-price auctions to prevent advertisers from overpaying by reducing bids based on impression-level estimates. But DV360 generally declined to use independent exchanges' bid-shading tools, and Poirot functioned as a targeted bid-reduction strategy aimed at exchanges associated with header bidding rather than a neutral advertiser-protection feature.

170.    Contrary to Google's misrepresentations, Project Poirot was not a standard bid-shading tool. It did not adjust bids impression by impression to improve advertiser ROI. Instead, DV360 broadly reduced bids on inventory sold through exchanges associated with header bidding. That across-the-board discount made those exchanges' auctions less competitive, pushed clearing prices down or caused DV360 to lose outright, and diverted volume toward AdX, which was not subject to the same bid reductions. By selectively disadvantaging rival exchanges while sparing AdX, Google used control of a major source of advertiser demand to distort competition among exchanges and blunt the competitive threat posed by header bidding.

171.    Google later also tried to justify Poirot as a measure to protect advertisers from "dirty auctions" during the industry shift from second-price to first-price auctions, but the surrounding facts and internal materials indicate that rationale was pretextual. By the time Poirot

53

was deployed, most major exchanges had already moved to first-price auctions, and other DSPs adapted without cutting spend across those exchanges. Where true bid shading existed, it operated at the impression level. Google's approach was categorical, and it largely spared AdX even though AdX's own mechanics had moved away from a pure second-price model. If the concern were genuinely auction-format risk, DV360 would have shaded bids into AdX as well, but it did not do so until later.

172.    Google has estimated internally that Poirot, together with another defensive program known as Project Elmo, reduced rival exchanges' revenue by about 21%. By cutting competitors' scale and economics, these programs made independent exchanges less attractive partners for publishers and prevented client-side header bidding from maturing into a sustained competitive constraint on Google's ad-server dominance. That reduction in rival scale also impaired their ability to invest, improve products, and attract additional advertiser demand, thereby reinforcing Google's monopolies in both the exchange and ad-server layers.

173.    Google's internal tracking also shows the objective was to shift spend back to AdX and weaken competitors, not to raise advertiser ROI. Google measured success by AdX revenue gains and rival-exchange declines, and internal commentary described Poirot as generating margins by moving inventory to AdX. In an internal discussion focused on combating header bidding, a Google employee reflected "Poirot has actually been quite effective, resulting in DBM [DV360] spending 7% more on AdX and reducing spend on most other exchanges." Internal reports celebrated increased advertiser spend on AdX and the loss of volume on other platforms as evidence of success. Indeed, in an internal email falsely labeled as "Privileged and Confidential" in an attempt to protect its contents from disclosure, a Google employee wrote that "Poirot currently generates margins by shifting inventory to AdX (outcome of Poirot)."

54

174.    Combined with Last Look, the strategy worked as intended: DV360 bid reductions lowered the rival exchanges' competitiveness, and AdX then used its informational advantage to win the same impression. The combined effect was exclusionary: Google first weakened rival exchanges' bids from the buy side and then captured the resulting auction wins on the sell side, using vertically integrated control to redirect volume to AdX and away from competitors.

## L.    Data Redactions

175.    If publishers and MCMs like Mediavine had known about Google's manipulation tactics, they would have pursued workarounds and tuned their auctions to keep independent exchanges competitive. But Google actively concealed the conduct by stripping key bid-level data from the auction reporting it provided to publishers. Google previously allowed publishers to see how the winning header-bidding bid compared to losing bids from other exchanges, including AdX, which let publishers evaluate the value of each participant and adjust auction settings such as whom to invite, how many bidders to include, and how long to run the auction. By removing that comparative information, Google made it far harder for publishers to detect systematic bid suppression and to respond effectively. This reduced publishers' ability to steer volume toward better-performing rival exchanges and thereby weakened a key mechanism by which market forces could have disciplined AdX.

176.    In 2018, Google further limited publisher visibility by removing two DFP reporting fields, "KeyPart" and "TimeUsec2." After that change, publishers could no longer match impression-level and bid-level data across header-bidding exchanges and Google's Exchange Bidding path, including AdX. That reporting blackout reduced publishers' ability to measure header bidding's relative performance and to tune auction design to maximize revenue. Google's reporting restrictions also prevented publishers from cross-checking whether the

ultimate winner of an impression was actually the highest bidder. By blocking comparisons between header-bidding outcomes and AdX bids in both directions, Google made it materially harder for publishers to identify irregularities, detect bid manipulation, or respond to anticompetitive tactics. As a result, rivals were denied the benefit of publisher-side optimization decisions that would have shifted volume toward exchanges offering better outcomes and away from Google's products when those products underperformed on a fair comparison.

177.    Google has continued these reporting constraints. As recently as last year, Google revised its data transfer files and represented that the files would be joinable, but it again removed key fields, which still prevents publishers from building a full, reliable comparison between header-bidding exchanges and AdX.

178.    Google's decision to strip information from DFP reporting makes sense only as a way to blunt competition and reduce publisher leverage. In a competitive market, an ad server would compete by giving publishers better, more actionable reporting, because publishers rely on ad-server data to run their operations and to make virtually every revenue-driving decision. Here, Google moved in the opposite direction by reducing transparency and making the tool less useful to its own customers. This Court has already found it plausible that Google's redactions depressed publisher prices by preventing publishers from tailoring and optimizing their header-bidding strategies. For the same reason, Google's use of redactions, hashing, and related techniques diminishes the value of the ad server while impairing publishers' ability to detect and respond to anticompetitive conduct. The redactions therefore harmed competition in both the ad-server and ad-exchange markets by degrading product quality, reducing publisher switching and optimization, and protecting Google's auction advantages from competitive challenge.

**M.    Unified Pricing Rules**

179.    By 2019, publishers were pressing Google to make its ad auctions more transparent and even-handed. At the same time, Google internally recognized that its scale and cross-stack policies were creating regulatory and competition risk. Against that backdrop, Google agreed to eliminate Last Look.

180.    At the same time, Google rolled out Unified Pricing Rules ("UPR"). The policy prevented publishers using DFP from setting a higher floor for AdX than for other exchanges, and it likewise barred publishers from setting higher floors for AdWords demand than for demand from other networks or DSPs. The policy was not truly "unified," however, because it still allowed publishers to set higher floors on third-party exchanges than on AdX. Google claimed UPR would "help[] its publisher customers simplify their decision-making, receive better matches, and increase revenue." EDVA Liability Op., 778 F. Supp. 3d at 871. But by eliminating publisher-side pricing tools that had been used to counteract Google's auction advantages and to promote competition among exchanges, Google used UPR to restrict a dimension of competition that publishers had been using to discipline AdX.

181.    Google understood that many DFP publishers set higher floors for AdX than for other exchanges as a deliberate strategy to reduce reliance on Google's stack. Publishers valued having meaningful volume flow through alternative demand sources, even if that diversification came with some short-term yield tradeoffs. Publishers also used higher AdX floors as a brand-safety and quality filter, because they associated low-priced AdX wins with lower-quality ads, including ads driven by smaller AdWords advertisers. The AdX team saw the termination of Last Look "as an opportunity to significantly limit the ability of publishers to set floor prices per buyers." EDVA Liability Op., 778 F. Supp. 3d at 871. Removing that choice weakened

57

publishers' ability to sponsor competition among exchanges and forced them to accept more volume through AdX on Google's preferred terms.

182.    Publishers also used higher AdX-specific floors to counteract AdX's opacity. Because publishers could not see inside AdX's pricing and bid mechanics, many suspected that AdX's auction outcomes did not reflect true competition. Raising the AdX floor forced AdX to clear closer to the real value of demand or lose the impression, which reduced AdX's ability to win with minimally incremental bids and made AdX behave more like the first-price dynamics publishers were seeing on other exchanges.

183.    When publishers sought ways to work around UPR and preserve exchange competition, for example, by applying multipliers to the bids from competing exchanges, Google included misrepresentations to publishers in its 2019 Best Practices guide that doing so would not "maximize yield."

184.    UPR thus shifted volume and revenue toward AdX and away from competing exchanges and publishers. After the change, AdX won more impressions and captured more revenue, while third-party exchanges lost both impressions and scale. And publishers and MCMs like Mediavine saw less revenue. The loss of scale by rival exchanges reduced their ability to constrain AdX's pricing and product decisions and made them less effective competitive alternatives for publishers going forward.

185.    Internal Google discussions treated that outcome as aligned with the core aim of the policy, which was to benefit AdX.

186.    More broadly, the policy operated as another restriction imposed through Google's publisher-side dominance. By using control over DFP to remove publisher pricing options that had supported competition, Google limited publishers' ability to route demand to

58

rivals, reduced rival scale, and made it harder for competitors to constrain Google's terms. In effect, Google used monopoly leverage to take away a choice publishers had been using to promote competition. That is harm to the competitive process itself: UPR did not merely change how publishers priced inventory but disabled a publisher-side competitive tool that had been helping publishers and rival exchanges discipline AdX.

## IV.    PRIOR COURT DECISIONS

### A.    Collateral Estoppel

187.    On April 17, 2025, the Court in the Eastern District of Virginia issued its 115-page opinion in U.S. v. Google holding that Google "willfully engaged in a series of anticompetitive acts to acquire and maintain monopoly power in the publisher ad server and ad exchange markets for open web advertising" and unlawfully tied "its publisher ad server and ad exchange together." EDVA Liability Op., 778 F. Supp. 3d at 873. The final conclusion of that opinion was that Google's "exclusionary conduct substantially harmed Google's publisher customers." *Id.*

188.    In reaching this conclusion, the EDVA found: "publisher ad servers for open-web display advertising constitute a distinct relevant product market" and "ad exchanges for open-web display advertising constitute a distinct relevant product market." EDVA Liability Op., 778 F. Supp. 3d at 833–34, 837. Additionally, the court found "the relevant geographic market for both publisher ad servers for open-web display advertising and ad exchanges for open-web display advertising is worldwide," excluding countries where the operation of ad tech companies is substantially restricted. *Id.* at 847-49, n.26.

189.    Regarding monopoly power, the court found: "Google possesses monopoly power in the publisher ad server for the open-web display advertising market" and "Google possesses monopoly power in the ad exchange for open-web display advertising market." EDVA Liability Op., 778 F. Supp. 3d at 850, 852.

59

190.    In assessing Google's exclusionary conduct, the court ruled: Google's "tying of DFP to AdX has had a substantial anticompetitive effect in the publisher ad server market for open-web display advertising. Accordingly, the AdX-DFP tie has violated both Section 1 and Section 2 of the Sherman Act." *Id.* at 864.

191.    Finally, the court concluded that "Google's monopolies in the publisher ad server and ad exchange markets, enhanced by the AdX-DFP tie, have enabled Google to introduce a series of anticompetitive policies, practices, and technology changes to its sell-side ad tech tools that were not in its publisher customers' best interests." *Id.* These anticompetitive practices included First Look, Last Look, Dynamic Revenue Share, and Unified Pricing Rules. *Id.* at 864-65.

192.    In October 2025, this Court ruled that the findings from U.S. v. Google have preclusive effect on the claims of certain private publisher plaintiffs in the MDL through the doctrine of collateral estoppel. Specifically, this Court held that:

> Google is precluded from relitigating, inclusive of the balancing of procompetitive benefits and anticompetitive effects, the following findings and conclusions in the E.D. Va. Action: (1) the existence of separate and distinct markets for publisher ad servers and ad exchanges, (2) that the ad server and ad exchange markets are worldwide in scope, excluding countries restricting access to the internet or subject to U.S. sanctions, (3) that Google has engaged in the following anticompetitive conduct which support's the Publisher Movants' claim that it willfully acquired and maintained its monopoly power in the ad server and ad exchange markets: Unlawful Tying, First Look, Last Look, Dynamic Revenue Share and Unified Pricing Rules, and (4) that Google has unlawfully tied DoubleClick for Publishers and AdX in violation of section 1 of the Sherman Act.

Issue Preclusion Order, 2025 WL 3012840, at *17. Google has stipulated to the application of collateral estoppel for other plaintiffs in the MDL as well. *See* ECF No. 1398.

B.    **Multidistrict Litigation Dismissal Decisions**

193.    This Court has also already addressed claims regarding Google's other forms of exclusionary conduct. Specifically, this Court has found that other plaintiffs plausibly alleged that Enhanced Dynamic Allocation harmed competition in the ad exchange market (though not the ad server market) and that Google may have been "untruthful" with its publisher customers about the feature. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 386 (S.D.N.Y. 2022); *In re Google Digit. Advert. Antitrust Litig.*, 721 F. Supp. 3d 230, 269-70 (S.D.N.Y. 2024).

194.    This Court also found plaintiffs plausibly alleged that Project Bernanke and its variants, including Global Bernanke and Bell, were anticompetitive measures that harmed competition in the ad exchange market, with Bell also harming competition in the ad server market. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 388-89.

195.    This Court likewise held that plaintiffs plausibly alleged that Google's DRS program was anticompetitive conduct harming competition in the ad exchange market. The Court explained that DRS manipulated AdX's exchange fee after bids were received and after Google "peeked" at bids on rival exchanges, allowing AdX to adjust its fee and win impressions it otherwise would have lost. Because Google possessed bid information uniquely available through its publisher ad server, DRS allowed AdX to win transactions through price manipulation rather than competition on the merits, thereby harming competition among exchanges. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 389-91.

196.    This Court has also already recognized the exclusionary risk posed by Minimum Bid to Win. The Court found it plausible that Google used bid information obtained through publisher ad servers, together with historical bidding data, to push down the prices paid for publisher impressions. The Court further held that these allegations "plausibly explain[] how Google used its market dominance to benefit consumers of its ad-buying tools at the expense of

61

consumers of its publisher ad servers." *In re Google Digit. Advert. Antitrust Litig.*, 721 F. Supp. 3d at 259-60.

197.    This Court also already found it plausible that Projects Poirot and Elmo had anticompetitive effects. The Court concluded similarly situated publishers' complaints plausibly alleged that Poirot harmed competition in the ad exchange market by using DV360 to gather intelligence about rival exchanges and then steering spend away from those rivals and toward AdX. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 398.

198.    This Court has likewise held that allegations concerning Google's data redactions plausibly allege anticompetitive conduct. The Court found plausible the allegations regarding harm to competition in the exchange market and in the ad server market, where it plausibly resulted in depressed prices to publishers. *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 396-97.

199.    While this Court has held that Exchange Bidding allegations, standing alone, do not plausibly allege actionable anticompetitive conduct, it has permitted factual allegations regarding Exchange Bidding to survive to the extent they "describe features, methods or aspects of the DFP–AdX product tie and Google's monopolization and attempted monopolization of the markets for ad servers and ad exchanges." *In re Google Digital Advert. Antitrust Litig.*, No. 21-MD-3010 (PKC), 2026 WL 91448, at *9 (S.D.N.Y. Jan. 13, 2026).

## V.    MEDIAVINE'S ANTITRUST INJURY

200.    Google's anticompetitive conduct harmed Mediavine and other publishers in two ways. First, it deprived Mediavine of the fruits of competition in the ad server and exchange markets. Mediavine and other MCMs and publishers rely on those markets to monetize their content. Healthy competition is key to Mediavine's business model. But Google foreclosed meaningful alternatives and left publishers with limited ability to switch providers. By tying DFP

to AdX and reinforcing that tie through additional exclusionary policies, Google ensured that the bulk of publisher inventory—including Mediavine's inventory—would be routed through Google's own products rather than competing exchanges and ad servers. Because Google controls both the dominant publisher ad server and the dominant ad exchange, publishers have no practical way to route substantial volumes of inventory through competing technologies. That forces publishers to accept Google's product quality, contractual terms, technical rules, and pricing structures.

201.    Reduced competition increased the effective "tax" Mediavine paid to Google. In a competitive market, exchanges and ad servers compete on price and terms, including fees, transparency, and auction mechanics. Here, Google faced limited competitive constraints and could maintain a durable 20% take rate on AdX. Neither Mediavine nor other publishers could meaningfully discipline that rate through switching, or even a credible threat of switching, because Google's tying of DFP to AdX and its restrictions on how publishers could access AdX demand made access to critical advertiser demand dependent on using Google's stack. Independent exchanges, by contrast, have had to compete head-to-head for Google's "scraps," and they have reduced their take rates over time to become more competitive in an attempt to attract publisher inventory away from Google's dominant platform.

202.    Google's market power also weakened its incentive to improve product quality for publishers. With publishers effectively captive, Google had less reason to compete by offering better tools or more efficient auctions. Instead, it had incentives to prioritize product changes that protected its dominant position, including rules and technical design choices that disadvantaged rivals and reinforced publisher dependence on Google's products.

203.    Second, in addition to depriving Mediavine of the benefits of competition generally, Google's conduct caused direct revenue harm. Google's practices were forms of auction manipulation. Those manipulations preserved and extended Google's market power, but they also reduced what Mediavine and other publishers earned for their inventory.

204.    The AdX–DFP tie itself directly reduced competition for publisher inventory. Because AdX would provide real-time bids only to publishers using DFP, publishers such as Mediavine were effectively required to use Google's ad server in order to access AdX demand, including the uniquely large pool of advertisers bidding through AdWords. This restriction prevented rival publisher ad servers from placing AdX into real-time competition with other exchanges and deprived rival exchanges of the scale necessary to compete effectively. As a result, auctions for Mediavine's inventory frequently occurred with fewer competing exchanges than would have participated in a competitive market, which reduced bid competition and lowered the clearing prices Mediavine received for those impressions and prevented rival exchanges from gaining the scale necessary to challenge AdX's dominance.

205.    Google's exclusionary policies further enhanced the harm to Mediavine. For example, First Look reduced revenue for publishers such as Mediavine by letting AdX win an impression once it cleared the publisher's floor, even if a rival exchange was prepared to pay more. In practice, AdX could take an impression at a lower price while DFP never evaluated higher competing bids. That design suppressed price competition from other exchanges and prevented publishers from realizing the full value of their inventory. Google's own analyses showed that when exchanges competed directly, publishers' clearing prices rose materially, including by an average of roughly 40%. First Look prevented that competition from taking

place by ensuring AdX had the first opportunity to win impressions before competing exchanges could submit real-time bids.

206.   Last Look also caused significant direct financial harm to Mediavine and other publishers. It let AdX see competing exchanges' bids before finalizing its own bid, giving Google and its advertisers an informational advantage that rival exchanges did not have. At the time, AdX used a second-price auction, so the price AdX would ordinarily submit reflected its second-highest internal bid. Without Last Look, AdX would lose impressions whenever that second-highest bid fell below the best competing bid. With Last Look, AdX could instead use the top rival bid as its effective floor, bid just enough to clear it, and win impressions it otherwise would have lost without raising the price paid to the publisher.

207.   The net effect of Last Look was to reduce publisher revenue when AdX's advertisers were willing to pay materially more than rivals. Because AdX could see the highest competing bid, it could shade its bid and win by the smallest increment above that bid, rather than bidding up to the true value its advertisers placed on the impression. For example, if a rival exchange bid $1.00 CPM and an AdX advertiser valued the impression at $1.50 CPM, AdX could win at $1.01 CPM, leaving the publisher about $0.49 CPM worse off.

208.   Enhanced Dynamic Allocation also harmed publishers, including Mediavine, by letting Google systematically skim the highest-value impressions for AdX while diluting the inventory available to direct-sold campaigns. When AdX can outbid or override direct allocation on an impression-by-impression basis, it tends to capture the impressions most likely to clear at premium prices. That leaves direct deals with lower-quality impressions, which in turn reduces direct-campaign performance and makes Mediavine's and others' direct offerings less attractive to advertisers.

65

209. Over time, that dynamic undermines both current and future direct deals. Advertisers are less willing to pay premium rates when the publisher cannot reliably deliver high-value placements through direct channels. Publishers also lose leverage in negotiations because they cannot credibly promise the same quality and mix of inventory. The result is a structural shift of value away from the publisher's direct-sales business and toward Google's exchange, even when a competitive and publisher-controlled allocation process would have preserved greater direct revenues for Mediavine and other publishers.

210. Google's auction manipulation through Project Bernanke and its variants also harmed Mediavine by reducing what Mediavine received for impressions that cleared through AdX. Because Mediavine sells a substantial volume of inventory through programmatic auctions, small per-impression reductions compound into meaningful losses across millions or billions of impressions. Bernanke's design allowed Google to increase its own margin on Mediavine's transactions by widening the spread between what advertisers were willing to pay and what AdX ultimately paid out to Mediavine, while still keeping AdX competitive enough to win. The result was that Mediavine captured less of the value of its inventory than it would have in a transparent, competitive auction, and the value that should have gone to Mediavine was diverted to Google.

211. Google's DRS program also harmed Mediavine by allowing AdX to win auctions through fee manipulation rather than genuine competition. As the Court recognized, DRS permitted AdX to adjust its exchange fee only after Google had "peeked" at bids on rival exchanges using information available through its publisher ad server. By selectively lowering its fee just enough to clear competing bids, AdX could win impressions that otherwise would have been sold through rival exchanges offering higher-value bids. Because these adjustments were

calibrated only to win the auction—not to maximize publisher yield—publishers like Mediavine received no additional revenue from those transactions. Google then recouped those temporary fee reductions by charging higher take rates on other impressions where competitive pressure was weaker, which reduced the net revenue publishers like Mediavine received for their inventory overall.

212.    Google's Minimum Bid to Win program likewise harmed Mediavine by depressing the bids advertisers submitted for its inventory in a manner similar to Last Look's informational advantage. As the Court recognized, Minimum Bid to Win allowed Google to use bid data obtained through its publisher ad server and historical bidding information across exchanges to calculate the lowest price necessary to win an auction. Advertisers using Google's buying tools could therefore bid just enough to clear the auction rather than bidding their true value for the impression. This practice reduced the number of competitive bids and systematically lowered clearing prices for impressions sold by Mediavine's platform because Google's buying tools could predict and narrowly beat competing bids across large volumes of auctions.

213.    Project Poirot also harmed Mediavine by reducing the competitiveness of bids submitted through rival exchanges. As the Court recognized, Google used DV360 to identify exchanges participating in header bidding and then reduced advertiser spending on those exchanges while directing demand toward AdX. By steering advertiser demand away from competing exchanges, Google reduced the number and competitiveness of bids those exchanges could submit for publisher impressions. This conduct weakened exchange competition and caused Mediavine to receive fewer bids and lower clearing prices for the inventory it sold.

67

214.    Google's redaction of auction data likewise harmed Mediavine by impairing its ability to evaluate and optimize competing exchange demand. As this Court has recognized, by removing key auction data, Google prevented publishers, including Mediavine, from comparing the performance of AdX with rival exchanges and tailoring their auction configurations accordingly. These restrictions reduced the competitiveness of bids submitted through rival exchanges and depressed the prices publishers could obtain for their impressions, resulting in lower bids and clearing prices for the inventory Mediavine sold and making it more difficult for publishers like Mediavine to detect and counteract Google's auction manipulation practices.

215.    Google's Unified Pricing Rules also harmed Mediavine by eliminating publishers' ability to use differentiated floor prices to counteract Google's auction advantages. Before UPR, publishers could set higher floor prices for AdX or for Google's buying tools in order to blunt the informational and structural advantages those tools possessed within DFP and to force AdX to bid closer to the true value advertisers placed on an impression. UPR eliminated that strategy by requiring publishers to apply uniform price floors across exchanges. As a result, AdX could win impressions with lower bids than it would otherwise have been required to submit, reducing publishers' ability to promote exchange competition and lowering the clearing prices publishers and MCMs like Mediavine received for their inventory.

216.    Exchange Bidding also reinforced the competitive advantages created by Google's tying arrangements. Although Google promoted Exchange Bidding as a mechanism to increase competition among exchanges, the program preserved structural advantages for AdX, including access to user identification data and the ability to displace rival bids within Google's ad server. In this way, Exchange Bidding functioned as a mechanism through which Google maintained and strengthened the AdX/DFP tie. To the extent Exchange Bidding affected

68

Mediavine's auctions, it did so by reinforcing those existing distortions, reducing competitive pressure from rival exchanges and contributing to lower bid competition and clearing prices.

217. Google also harms Mediavine's Journey platform through the same tying practices and anticompetitive conduct that preserve Google's dominance across the ad tech stack. Advertisers using Google's AdWords buying tool seek to reach audiences across the open web, including the smaller publishers served through Mediavine's Journey platform. In a competitive market, those advertisers would bid for that inventory through multiple exchanges in order to reach those audiences. In that same competitive market, AdX itself would also bid for that inventory—competing alongside other exchanges for those impressions—rather than being restricted to inventory routed through DFP. But Google restricts AdWords demand to AdX and prevents AdX itself from bidding into those Journey auctions because AdX limits its real-time bidding to only those publishers using DFP. As a result, Journey publishers cannot compete for AdWords or AdX demand and their inventory must instead be sold through a smaller pool of non-Google demand sources, including competing exchanges. These restrictions suppress competition for Journey inventory and cause Mediavine to receive lower bids and lower clearing prices for the impressions it sells, capturing less of the value of that inventory than it would in a competitive market where AdWords demand could compete across exchanges and AdX could compete on equal terms for Mediavine's inventory.

218. Google's conduct operates through a globally integrated advertising system in which auction rules, pricing mechanisms, and demand sources are applied across markets without regard to geographic boundaries. Advertisers bid across geographies and exchanges aggregate demand from multiple regions, such that auction outcomes in one market affect pricing and competition in others. As a result, Google's conduct had direct, substantial, and reasonably

69

foreseeable effects on U.S. commerce, including by reducing bid competition and lowering clearing prices for advertising impressions sold to U.S. users and publishers. Mediavine seeks recovery for all damages caused by Google's conduct to the fullest extent permitted under U.S. antitrust law, including damages arising from transactions outside the United States that are part of this integrated system.

## VI.    STATUTE OF LIMITATIONS

219.    The statute of limitations in antitrust cases is four years, *see* 15 U.S.C. § 15(b), but the filing of the first putative publisher class action on December 15, 2020 tolled the statute of limitations for all members of the proposed AdX Publisher Class under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and its progeny. In December 2025, this Court certified an AdX publisher class that included Manage Inventory MCMs. Mediavine falls within the scope of that proposed class definition. Accordingly, the statute of limitations applicable to Mediavine's claims has been tolled since December 15, 2020.

220.    In addition, the Department of Justice's suit in U.S. v. Google, which was filed on January 24, 2023, tolled the statute of limitations while those proceedings are still pending and for one year thereafter, *see id.* § 16(i). Mediavine's claims are based at least in part on the matters at issue in the DOJ's case. This Court previously applied this statutory tolling to claims "based in whole or in part on those brought" in U.S. v. Google. *See* MDL ECF No. 1336. Mediavine's claims are similarly tolled by the DOJ's case.

221.    Much of the anticompetitive conduct that Google has used to unlawfully maintain its monopolies described in this Complaint began after December 15, 2016 (based on *American Pipe* tolling) and even after January 24, 2019 (based on government tolling), and it has continued to this day. For example, Google implemented Project Poirot in 2017, the data redactions

described above in 2018, Unified Pricing Rules in or around May of 2019, and Project Alchemist, a new first-price version of Project Bernanke, after January 24, 2019, as well.

### A.   Google's Pattern of Conduct Constitutes a Continuing Violation

222.   Google's long pattern of anticompetitive conduct constitutes a continuing violation. The continuing violation doctrine covers claims based on conduct that began prior to the limitations period and continued into that period where Google committed independent and overt acts within the limitations period as part of its broader scheme and those new acts caused new and accumulating harm in the limitations period. Google's practices have consistently and continually evolved over the years, and publishers like Mediavine have suffered new and accumulating injury from each of Google's new acts designed to thwart competition.

#### 1.   AdWords-AdX Tie

223.   Google's requirement that AdWords advertisers only bid through AdX, rather than through rival exchanges, constitutes a continuing violation. Google maintains this unlawful tie by continuously signing up new advertisers for AdWords and subjecting them to the same tying arrangement. Each time Google signs a new contract with an AdWords advertiser that prohibits the advertiser from submitting bids to rival exchanges constitutes a new and affirmative instance of the tying arrangement. Google has signed up thousands of new advertisers to AdWords during the limitations period. Publishers like Mediavine suffer new injury each time an advertiser is subjected to this requirement, because the tying arrangement increases their dependency on AdX and reduces the number of competitive bids that would otherwise come from rival exchanges.

#### 2.   DFP-AdX Tie

224.   Google's tying of DFP to AdX is a similar continuing violation. Since acquiring DFP, Google has required all publishers to use DFP to access real-time bids from AdX. And beginning in 2018, Google combined the two products under the name GAM. Today, Google

71

continues to prevent publishers using rival ad servers from receiving real-time bids from AdX, which stops publishers from placing AdX in competition with real-time bids from other ad exchanges.

225.    Each time Google enforces the requirement that publishers use DFP to obtain real-time AdX bidding constitutes a new and affirmative act in furtherance of the tying arrangement that maintains its monopoly power in the relevant markets. Google continues to implement and enforce this restriction on an ongoing basis by denying real-time AdX bids to publishers that use rival ad servers and by requiring publishers, including Mediavine, to transact through DFP to access AdX demand. In addition, each auction conducted under this tied system—and each impression sold through DFP subject to these restrictions—inflicts new and independent harm on publishers like Mediavine by suppressing competition and reducing the bids and clearing prices they receive for their inventory. In addition, each time a new publisher signs up with DFP and is subject to the same tying arrangement is a new and affirmative act. Every auction conducted under the tied system and each new publisher forced to use DFP as its ad server to access real-time AdX demand reinforces the power of Google's tying arrangement and inflicts new and independent harm on publishers like Mediavine. *See* MDL ECF No. 1336 at 20 (finding that Rumble "adequately alleged that the DFP-AdX product tie is an act that 'inflicted continuing and accumulating harm'" (citation omitted)).

### 3.    Google's Conduct Enhancing its Product Ties Are Continuing Violations

226.    Google's anticompetitive product ties work in conjunction with other conduct described in this Complaint, including First Look, Last Look, DRS, Project Poirot, and UPR. Google used these various mechanisms of auction manipulation in service of a single,

continuing, and evolving scheme to acquire and maintain monopoly power in the publisher ad servers and ad exchanges markets. This conduct has caused harm to publishers like Mediavine.

227.    Google has used policies like First Look, Last Look, DRS, and UPR to reinforce and strengthen its product ties by ensuring that rival ad servers and ad exchanges could not take share away from Google. By way of example, "First Look exacerbated the anticompetitive effect of the unlawful AdX-DFP tie by artificially advantaging AdX within DFP's auction logic at the expense of Google's publisher customers." EDVA Liability Op., 778 F. Supp. 3d at 864. On Last Look, the court went on to say, "[b]ut header bidding has failed to erode DFP's dominance because subsequent Google product changes such as Last Look enhanced the power of the AdX-DFP tie. EDVA Liability Op., 778 F. Supp. 3d at 862. Regarding UPR, the Court in U.S. v. Google concluded that "Google implemented Unified Pricing Rules to enhance the AdX-DFP tie, and not for its proffered justifications." EDVA Liability Op., 778 F. Supp. 3d at 871. UPR was implemented into DFP "at the request of" the AdX team to limit publisher's ability to set floor prices for different buyers in DFP, thereby "enhancing AdX's control over DFP publishers' revenue streams." *Id.*

228.    Although each of Google's anticompetitive policies described above has inflicted harm on their own, none would work effectively in isolation. Rather, these policies are each instrumental pieces of Google's broader anticompetitive scheme to monopolize the relevant markets for years. The European Commission recently concluded after extensive review that Google's anticompetitive conduct constituted a single, continuous infringement from 2014 through 2025. *See* Case AT.40670—Google–Adtech & Data-related practices, Eur. Comm'n, DG Competition Decision, 2025 (the "EC Decision") ¶¶ 2076-77. The European Commission viewed Google's various types of conduct, including the imposition of Project Poirot and UPR, as a

single continuing violation because "Google's different forms of conduct pursued an identical objective and were complementary . . . . Each of these forms of conduct did not individually last for the entire period of the Infringement, but they evolved over time, together forming a continuum of abusive behaviour[.]" *Id.* ¶ 2218.

**B.      Google Fraudulently Concealed Project Bernanke, EDA, DRS, and Project Poirot into the Statutory Period.**

229.    Google's proactive secrecy fraudulently concealed several of the relevant instances of anticompetitive conduct, including Project Bernanke and its variants, EDA, DRS, and Project Poirot, from Mediavine and other industry participants. These programs were "opaque and not well-understood outside of Google, including by competitors, as well as customers of both the DFP and AdX." *See* MDL ECF No. 1336 at 19; *see also In re Google Digit. Advert. Antitrust Litig.*, 721 F. Supp. 3d at 272 ("The complaint plausibly explains how Google's [EDA] concealments and omissions misled Gannett . . . ."); *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d at 406 (observing that much of Google's alleged anticompetitive conduct "lacked transparency, occurred out of the public eye, and had effects that were not immediately obvious or well understood"). Mediavine had no way to uncover the truth about these policies during the limitations period because of Google's purposeful concealment.

230.    Google never disclosed the existence of Project Bernanke or new variants like Project Alchemist to publishers. Because Google did not provide publishers with information about the bids AdWords submitted, publishers had no way of uncovering these projects' existence. Further, Google affirmatively told publishers like Mediavine that AdX ran a second-price auction, despite knowing that this was false for impressions where Bernanke impacted the price of bids. Google Group Product Manager Scott Spencer, for example, stated in 2010 that

"AdX is a second price auction with minimum CPMs set by the publisher."[5] Google continued to make these claims at least through May 2019, when Google Director of Product Management Jason Bigler explained that Google was then running "a second price, real-time bidding auction."[6]

231.    In 2014, Google started opting publisher customers into DRS but kept details about the program secret. By the end of 2015, Google opted all DFP publishers into the program but still did not disclose information about it. Google eventually told publishers in 2016 that it was launching a "revenue share-based optimization" to increase publishers' yields. Google's description of the program contained false information because Google knew that DRS did not increase publishers' yields. Google concealed from publishers the fact that AdX would recoup lost revenue from impressions where DRS lowered AdX's take rate by using a higher AdX take rate on different impressions. Because DFP did not provide publishers with information on bids that did not win, publishers could not discover the truth about Google's auction manipulations no matter how diligently they investigated them.

232.    This Court has already found that similar allegations regarding Enhanced Dynamic Allocation were sufficient to show that Google fraudulently concealed the truth about the program. *In re Google Digital Advertising Antitrust Litigation*, 721 F. Supp 3d at 271-72 (denying Google's motion to dismiss Enhanced Dynamic Allocation claims as untimely where Google "made 'false' representations for 'many years' about the purpose and effects of EDA,"

---

[5] adexchanger, *Google's Scott Spencer On DoubleClick Ad Exchange Auction And Data Management* (Feb. 9, 2010), *at* https://www.adexchanger.com/ad-exchange-news/googles-scott-spencer-on-doubleclick-ad-exchange-auction-and-data-management/.

[6] Jason Bigler, *An update on first price auctions for Google Ad Manager*, Google Ad Manager (May 10, 2019), *at* https://blog.google/products/admanager/update-first-price-auctions-google-ad-manager/.

was unwilling to disclose sales data related to EDA, and where the implementation of EDA had a "secretive nature").

233.    Google also fraudulently concealed Project Poirot even though rival DSPs publicly acknowledged their own bid-shading programs. Google introduced Poirot "gradually" over several phases and started with a limited amount that DV360 could shade bids into rival ad exchanges. Publishers had no visibility into the bid reductions that DV360 was implementing, so they had no way of knowing that Google's manipulations were driving more of their revenue through AdX.

## CLAIMS

## I.    COUNT ONE – MONOPOLIZATION AND MONOPOLY MAINTENANCE OF THE AD SERVER MARKET (SHERMAN ACT § 2)

234.    Mediavine restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth herein.

235.    The market for publisher ad servers for open-web display advertising worldwide, excluding countries that restrict access to the internet (e.g., China) or are subject to U.S. sanctions (e.g., Iran), is a relevant antitrust market, and Google has monopoly power in that market. Google possesses monopoly power in that market as reflected in its durable market share exceeding 90%, the absence of meaningful substitutes, substantial switching costs, high barriers to entry and expansion, and strong network effects that protect DFP from competitive discipline.

236.    Mediavine is a direct purchaser and customer of Google in the publisher ad server market.

237.    Google has unlawfully monopolized the worldwide market for publisher ad servers for open-web display advertising through an exclusionary course of conduct consisting of the anticompetitive acts described herein. Each of Google's interrelated and interdependent

actions increased, maintained, or protected its publisher ad server monopoly and had a cumulative and synergistic effect that has harmed competition and the competitive process.

238. Google unlawfully tied its publisher ad server (DFP) to its ad exchange (AdX) in violation of Section 2 of the Sherman Act: (i) DFP and AdX are separate and distinct products in separate relevant markets; (ii) Google conditioned access to the tying product—AdX—on publishers' use of DFP, including by refusing to provide real-time AdX bidding to publishers that used rival ad servers; (iii) Google possesses economic power in the tying product market for publisher ad exchanges sufficient to restrain trade in the relevant market for publisher ad servers; and (iv) the tie affected a substantial volume of commerce in the tied product market for publisher ad servers, foreclosing rival ad servers from access to publishers that required AdX demand. The tying arrangement lacked any procompetitive justification and instead served to acquire, maintain, and reinforce Google's monopoly power in the publisher ad server market.

239. In addition, the following anticompetitive conduct, individually and taken together, played an important role in enhancing and maintaining Google's publisher ad server monopoly:

a.   the AdX/DFP Tie;

b.   the AdWords/AdX Tie, which reinforced DFP's indispensability;

c.   First Look;

d.   Last Look;

e.   Enhanced Dynamic Allocation;

f.   Project Bernanke and its variations;

g.   Dynamic Revenue Sharing;

77

h.      Exchange Bidding, as part of Google's integrated conduct reinforcing the AdX/DFP tie and its monopolization of the ad server market;

i.      Minimum Bid to Win;

j.      Project Poirot;

k.      Google's redaction of auction data and related reporting limitations; and

l.      Unified Pricing Rules.

240.    Google's exclusionary conduct has foreclosed rival publisher ad servers from competing on the merits, prevented publishers from placing DFP into real-time competition with alternative ad servers, increased switching costs, and impaired publishers' ability to evaluate and optimize competing exchange demand. By conditioning access to AdX's unique demand on use of DFP and embedding structural advantages for AdX within DFP's auction rules and other anticompetitive conduct alleged herein, Google deprived rival ad servers of the scale necessary to compete effectively. Google's conduct has foreclosed a substantial share of the publisher ad server market to rivals by denying them access to AdX's unique demand and the transaction volume necessary to achieve competitive scale, thereby raising rivals' costs, denying rivals efficient scale, impairing entry and expansion by rivals, and entrenching DFP's dominance. Google's conduct also reduced the ability of rival ad servers to facilitate competitive auctions across exchanges, thereby degrading auction quality and reducing the prices publishers could obtain for their inventory.

241.    Google's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Google's anticompetitive and unlawful conduct.

242.    Google's exclusionary conduct violated and continues to violate Section 2 of the Sherman Act, which prohibits "monopoliz[ing]… any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

243.    Google's exclusionary conduct harmed Mediavine, including in its capacity as a direct purchaser and customer of Google as the seller of record for inventory transacted through DFP and AdX. As alleged herein, Google has harmed Mediavine in a manner that the antitrust laws were intended to prevent. Mediavine has suffered and continues to suffer substantial damages and irreparable injury to its business or property as a direct and proximate result of Google's unlawful conduct. Mediavine will subsequently quantify the monetary damages caused by Google's unlawful conduct. Mediavine is entitled to treble damages for Google's violations of the Sherman Act as well as injunctive relief ending that conduct.

## II.    COUNT TWO – MONOPOLIZATION AND MONOPOLY MAINTENANCE OF THE AD EXCHANGE MARKET (SHERMAN ACT § 2)

244.    Mediavine restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth herein.

245.    The market for open-web display ad exchanges worldwide, excluding countries that restrict access to the internet (e.g., China) or are subject to U.S. sanctions (e.g., Iran), is a relevant antitrust market, and Google has monopoly power in that market. Google possesses monopoly power in that market as reflected in its durable market share exceeding 60%, its ability to maintain a supracompetitive take rate of approximately 20% for years, the absence of meaningful substitutes, substantial switching costs, high barriers to entry and expansion, and strong network effects that protect AdX from competitive discipline.

246.    Mediavine is a direct purchaser and customer of Google in the ad exchange market.

79

247. Google has unlawfully monopolized the worldwide market for open-web display ad exchanges through an exclusionary course of conduct consisting of the anticompetitive acts described herein. Each of Google's interrelated and interdependent actions increased, maintained, or protected its ad exchange monopoly, and they had a cumulative and synergistic effect that has harmed competition and the competitive process.

248. The following exclusionary conduct, individually and taken together, played a particularly important role in unlawfully establishing or maintaining an ad exchange monopoly:

a. the AdX/DFP Tie;

b. the AdWords/AdX Tie;

c. First Look;

d. Last Look;

e. Enhanced Dynamic Allocation;

f. Project Bernanke and its variations;

g. Dynamic Revenue Sharing;

h. Exchange Bidding, as part of Google's integrated conduct reinforcing the AdX/DFP tie and its monopolization of the ad exchange market;

i. Project Poirot;

j. Google's redaction of auction data and related reporting limitations; and

k. Unified Pricing Rules.

249. Google's exclusionary conduct has drastically altered the supply paths through which available display advertising inventory is sold, reducing payouts to publishers, burdening publishers with lower-quality matches of advertisements to inventory, and inhibiting choice and innovation across the ad tech stack. Google's conduct has foreclosed a substantial share of the ad

exchange market to rival exchanges by depriving them of access to critical advertiser demand and publisher inventory, reducing their ability to win impressions and achieve efficient scale, raising rivals' costs, and weakening their ability to compete on price, transparency, and innovation. These effects reduced bid competition in auctions for publisher inventory, lowered clearing prices, and prevented rival exchanges from disciplining AdX's supracompetitive take rates.

250.    Google's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Google's anticompetitive and unlawful conduct.

251.    Google's exclusionary conduct violated and continues to violate Section 2 of the Sherman Act, which prohibits "monopoliz[ing]… any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. §2.

252.    Google's exclusionary conduct harmed Mediavine, including in its capacity as a direct purchaser and customer of Google as the seller of record for inventory transacted through AdX. As alleged herein, Google has harmed Mediavine in a manner that the antitrust laws were intended to prevent. Mediavine has suffered and continues to suffer substantial damages and irreparable injury to its business or property as a direct and proximate result of Google's unlawful conduct. Mediavine will subsequently quantify the monetary damages caused by Google's unlawful conduct. Mediavine is entitled to treble damages for Google's violations of the Sherman Act as well as injunctive relief ending that conduct.

## III.    COUNT THREE – ATTEMPTED MONOPOLIZATION OF THE AD EXCHANGE MARKET (SHERMAN ACT § 2)

253.    Mediavine restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth herein.

254.    To the extent that Google argues it does not have monopoly power in the relevant ad exchange market, Google has attempted to monopolize that market.

255.    The market for open-web display ad exchanges worldwide, excluding countries that restrict access to the internet or are subject to U.S. sanctions, is a relevant antitrust market.

256.    Google has engaged in anticompetitive and exclusionary conduct with the specific intent to monopolize the market for open-web display ad exchanges.

257.    Google's exclusionary conduct includes, but is not limited to:

a.      the AdX/DFP Tie;

b.      the AdWords/AdX Tie;

c.      First Look;

d.      Last Look;

e.      Enhanced Dynamic Allocation;

f.      Project Bernanke and its variations;

g.      Dynamic Revenue Sharing;

h.      Exchange Bidding, as part of Google's integrated conduct reinforcing the AdX/DFP tie and its monopolization and attempted monopolization of the relevant markets;

i.      Project Poirot;

j.      Google's redaction of auction data and related reporting limitations; and

k.      Unified Pricing Rules.

258.    Through this conduct, Google specifically intended to eliminate or substantially weaken rival ad exchanges, foreclose them from critical advertiser demand and publisher

82

inventory, raise their costs, deny them efficient scale, and entrench AdX as the dominant exchange in the market.

259. Google's conduct created a dangerous probability that it would achieve and maintain monopoly power in the ad exchange market. Google's durable market share exceeding 60%, its control over unique advertiser demand through AdWords and DV360, its integration with the dominant publisher ad server, and the strong network effects inherent in the exchange market created a substantial likelihood that its exclusionary conduct would result in sustained monopoly power.

260. Google's exclusionary conduct lacked any procompetitive justification and was undertaken to suppress competition rather than compete on the merits.

261. Google's conduct violated and continues to violate Section 2 of the Sherman Act.

262. As a direct and proximate result of Google's attempted monopolization, Mediavine has suffered and continues to suffer substantial damages and irreparable injury to its business and property.

## IV.    COUNT FOUR – UNLAWFUL TYING (SHERMAN ACT § 1)

263. Mediavine restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth herein.

264. Google has entered into agreements and imposed contractual and technological conditions that unlawfully tie its publisher ad server (DFP) to its ad exchange (AdX).

265. DFP and AdX are separate and distinct products in separate relevant product markets. Publisher ad servers for open-web display advertising and ad exchanges for open-web display advertising perform different functions, are priced differently, are purchased separately, and are not reasonably interchangeable.

266. Google conditioned access to the tying product—AdX—on publishers' adoption and continued use of the tied product—DFP—including by refusing to provide real-time AdX bidding to publishers that used rival ad servers, even where publishers would not have chosen DFP in a competitive market.

267. Google possesses economic power in the tying product market for publisher ad exchanges sufficient to restrain trade in the tied product market for publisher ad servers. AdX controls a dominant share of the exchange market and is a "must-call" exchange because of its unique advertiser demand and integration with Google's buy-side tools, enhanced by the AdWords/AdX tie.

268. The tying arrangement affected a substantial volume of commerce in the tied product market for publisher ad servers, foreclosing rival ad servers from access to publishers that required AdX demand and denying those rivals the scale necessary to compete effectively. The tying arrangement also reduced competition in the ad exchange market by limiting the ability of rival exchanges to compete for publisher inventory on equal terms and by reducing the number of competitive bids submitted in auctions for that inventory.

269. The tying arrangement lacked any procompetitive justification. The conditioning of AdX access on use of DFP was not necessary to improve product quality, prevent fraud, or enhance efficiency, but instead served to exclude rival ad servers and entrench Google's dominance.

270. Google's tying arrangement constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

271. As a direct and proximate result of Google's unlawful tying, Mediavine has suffered and continues to suffer substantial damages and irreparable injury to its business and

84

property, including supracompetitive fees, reduced competitive options, diminished auction transparency, and impaired ability to obtain competitive ad server services.

272.    Mediavine is entitled to treble damages, injunctive relief, and all other relief permitted under the antitrust laws.

## V.    COUNT FIVE – UNLAWFUL DECEPTIVE ACTS OR PRACTICES (NEW YORK GENERAL BUSINESS LAW §§ 349-50)

273.    Mediavine restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth herein.

274.    New York General Business Law §§ 349 and 350 prohibit deceptive acts or practices and false advertising in the conduct of business. The statutes are intended to protect consumers and participants in the marketplace from materially misleading practices that have a broad impact on the public, including materially misleading advertising and promotional representations.

275.    Google's deceptive acts and practices occurred in New York and affected New York-based publishers and advertisers, including through Google's substantial advertising and ad tech operations in New York. Google's representations were disseminated to and relied upon by market participants in New York, and the injuries suffered by Mediavine occurred in substantial part within New York.

276.    In another proceeding, Google stated that much of its conduct related to ad tech occurred in New York and that many of the relevant witnesses are based in New York. *See Texas v. Google*, No. 20-cv-00957 (E.D. Tex. Jan. 19, 2021), ECF No. 28, at 4-5; Tr. at 49-50 (E.D. Tex. Mar. 18, 2021), ECF No. 90. Google employees based in New York made misleading statements about the anticompetitive conduct alleged in this Complaint.

85

277.    Google engaged in consumer-oriented conduct within the meaning of GBL §§ 349 and 350 by making uniform, standardized representations to publishers, advertisers, and the broader market regarding the nature, fairness, transparency, and operation of its ad exchange and ad server products. These representations were disseminated through Google's public marketing materials, sales materials, publisher documentation, help centers, and contractual communications.

278.    Google deceived Mediavine through its acts and through its misleading or false statements. Google's opaque and anticompetitive actions reduced Mediavine's revenue. For instance, Bernanke and its successors were a method by which Google secretly suppressed the bids going to publishers. Other conduct such as DRS reallocated auction wins to AdX and suppressed the revenue available to publishers. Each auction conducted pursuant to Google's deceptive framework constituted a discrete application of the misleading practices described above and caused injury to Mediavine.

279.    Google represented, among other things, that AdX auctions operated as fair and neutral second-price auctions; that publishers would receive the highest eligible bid; that Enhanced Dynamic Allocation maximized publisher yield; that Google's auction rules were transparent; and that its systems operated in a manner that aligned publishers' interests with Google's. Google further represented that its auction tools maximize publisher revenue, that auction outcomes were determined solely by competitive bidding, and that publishers retained full visibility into auction mechanics and performance metrics.

280.    These representations were materially misleading. As described herein, Google secretly implemented auction mechanisms—including Project Bernanke and its variants, Dynamic Revenue Sharing, Minimum Bid to Win, and related auction design features—that

altered bidding outcomes, reallocated value, and suppressed publisher revenues in ways that were not disclosed to publishers. These undisclosed practices contradicted Google's express representations regarding auction neutrality and transparency.

281.    Google further engaged in deceptive omissions by failing to disclose material information regarding the operation of its auction systems, including the use of internal bid shading, pooled reserve pricing, preferential routing, and reporting redactions that impaired publishers' ability to evaluate auction outcomes and compare AdX performance to rival exchanges.

282.    Google's deceptive practices were consumer-oriented because they were directed at the broader marketplace of publishers and advertisers, not limited to a single bespoke contractual relationship. Google's standardized representations were made to thousands of publishers and advertisers nationwide and were intended to induce reliance on Google's ad tech ecosystem.

283.    Google's deceptive acts and omissions were material because a reasonable publisher or advertiser would consider information regarding auction mechanics, pricing rules, and revenue allocation important in deciding whether to use Google's products, how to configure auction settings, and whether to transact through competing exchanges or ad servers.

284.    Google implemented these materially misleading representations and omissions in connection with each AdX auction during the relevant period. Google applied the auction mechanisms described herein—including bid shading, internal pricing adjustments, preferential routing, and reporting redactions—on a standardized, transaction-by-transaction basis. For example, "Google exerts its bargaining power over publishers with take-it-or-leave-it terms: AdX

'charg[ed] a durable 20% take rate for well over a decade, and "Google has refused to negotiate AdX's take rate with almost all of its customers." E.D. Va. Op. at 852-53." ECF 1526 at 20.

285.    As a direct and proximate result of Google's deceptive conduct, Mediavine suffered actual injury. Mediavine paid supracompetitive exchange fees, received artificially depressed revenues for impressions transacted through AdX, and was deprived of the ability to make fully informed decisions regarding its use of Google's products and its participation in competing exchanges. Had Google disclosed the true operation of its auction systems, Mediavine would have altered its auction configurations, pricing strategies, and allocation of inventory across exchanges, thereby avoiding or mitigating the injuries described herein.

286.    Google's conduct was willful and knowing. Google was aware of the material nature of its auction modifications and reporting restrictions and intentionally concealed or misrepresented those practices while continuing to promote its products as transparent and publisher-aligned, satisfying the standard for enhanced damages under GBL §§ 349 and 350.

287.    Pursuant to N.Y. Gen. Bus. Law §§ 349(h) and 350-e(3), Mediavine is entitled to recover its actual or statutory damages, whichever is greater, for each violation as well as reasonable attorneys' fees and costs. Because Google's violations were willful and knowing, the Court may award treble damages as permitted under § 349(h) and § 350-e.

288.    Mediavine also seeks injunctive relief enjoining Google from continuing the deceptive practices described herein.

## VI.    COUNT SIX – COMMON-LAW FRAUD

289.    Mediavine restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth herein.

290.    Beginning no later than 2013 and continuing through the relevant period, Google made specific, affirmative representations to publishers, including Mediavine, regarding the operation of its ad exchange (AdX) and publisher ad server (DFP).

291.    These representations included statements in Google's publisher documentation, help center materials, product marketing materials, public blog posts, and direct communications with publishers that:

      a.    AdX operated as a fair and neutral "second price auction";[7]

      b.    Publishers would receive the highest eligible bid submitted in the auction;[8]

      c.    Google's auction rules were "fair" and "transparent";[9]

      d.    Google did not use publisher-provided data to inform bids submitted through its buying tools;[10]

      e.    Google's policies would benefit its customers, including by increasing revenue, serving better ads, and simplifying decision making;[11] and

      f.    Applying multipliers to bids from rival exchanges would not maximize yield.[12]

---

[7] *See e.g.,* adexchanger, *Google's Scott Spencer On DoubleClick Ad Exchange Auction And Data Management* (Feb. 9, 2010) ("AdX is a second price auction with minimum CPMs set by the publisher."), *at* https://www.adexchanger.com/ad-exchange-news/googles-scott-spencer-on-doubleclick-ad-exchange-auction-and-data-management/; Jason Bigler, *An update on first price auctions for Google Ad Manager*, Google Ad Manager (May 10, 2019) (Google was then running "a second price, real-time bidding auction."), *at* https://blog.google/products/admanager/update-first-price-auctions-google-ad-manager/.

[8] *Id.*; *see also infra* ¶ 141.

[9] *Id.*

[10] Google Ad Manager, *Service Specific Terms – Google Ad Manager Service*, *at* https://www.google.com/intl/en_us/google-ad-manager/publishers/sst/terms/ ("Google will not use data entered by Company into the Google Ad Manager user interface … for purposes of informing bids made on behalf of Google's AdWords service or the DoubleClick Bid Manager service … unless Company authorizes such use.").

[11] *See infra* ¶ 180 (Google claiming UPR would "help[] its publisher customers simplify their decision-making, receive better matches, and increase revenue").

[12] *See infra* ¶ 183 (discussing misrepresentations in Google's 2019 Best Practices guide).

292.    These statements were false and materially misleading when made because Google had implemented undisclosed auction mechanisms—including Project Bernanke and its variants, Dynamic Revenue Sharing, Minimum Bid to Win, preferential routing rules, bid shading logic, and internal reserve adjustments—that altered auction outcomes, reallocated value to Google or favored buyers, and suppressed publisher revenues.

293.    Google further omitted and concealed material information from publishers, including Mediavine, regarding the true operation of its auction systems, including:

      a.    Internal bid-shading algorithms used by Google's buying tools;

      b.    The pooling and reallocation of auction margins through mechanisms such as Project Bernanke and its variants;

      c.    Preferential routing and bid handling within DFP that advantaged AdX over rival exchanges;

      d.    The interaction between UPR and Minimum Bid to Win in determining auction clearing prices;

      e.    The interaction between Project Bernanke and Last Look, which together enabled AdX to win auctions while suppressing publisher payouts;

      f.    The use of publisher-side auction data and competitively sensitive bid information to inform Google's own bidding strategies;

      g.    The algorithms and internal rules used to calibrate bids using Minimum Bid to Win feedback across large volumes of impressions; and

      h.    Data redactions and reporting limitations that impaired publishers' ability to compare AdX performance to rival exchanges.

294.    Google had a duty to disclose these material facts because:

90

a.    It possessed exclusive and superior knowledge regarding the operation of its proprietary auction systems;

b.    It made partial and incomplete statements about auction transparency and neutrality that were misleading without disclosure of the omitted facts; and

c.    It stood in a position of trust and confidence with respect to the operation of the auction mechanisms it exclusively designed, controlled, and administered.

295.    Google knew that its representations and omissions were false and materially misleading at the time they were made. Google's internal design and implementation of the auction mechanisms described herein demonstrate actual knowledge of the true operation of its systems. Google intentionally concealed those mechanisms while promoting its products as fair and publisher aligned.

296.    Google made these misrepresentations and omissions with the intent to induce publishers, including Mediavine, to adopt and continue using DFP and AdX, to refrain from migrating inventory to rival ad servers or exchanges, and to transact advertising inventory through Google's ecosystem.

297.    Mediavine actually and justifiably relied on Google's representations and omissions. Google's auction systems are proprietary and opaque, and publishers could not independently observe or reverse engineer the internal logic governing bid allocation, revenue sharing, or routing decisions. Mediavine reasonably relied on Google's representations concerning auction neutrality, transparency, and yield maximization in:

a.    Entering into and maintaining contractual relationships with Google;

b.    Configuring auction parameters and pricing strategies;

c.    Allocating inventory between AdX and competing exchanges; and

91

d.      Transacting billions of ad impressions through Google's systems.

298.    As a direct and proximate result of Google's fraudulent conduct, Mediavine suffered damages, including but not limited to supracompetitive exchange fees, artificially depressed auction revenues, lost competitive alternatives, lost business opportunities, and reduced overall monetization of its managed inventory.

299.    Google's conduct was willful, malicious, and in reckless disregard of Mediavine's rights, entitling Mediavine to compensatory damages, punitive damages, and all other relief permitted under law.

## VII.    COUNT SEVEN – UNJUST ENRICHMENT

300.    Mediavine restates and incorporates by reference each of the preceding allegations in this Complaint as if fully set forth herein.

301.    Google has been unjustly enriched through the collection and retention of supracompetitive exchange fees, auction margins, and other revenues derived from the operation of its ad exchange and publisher ad server products.

302.    Google's enrichment came at Mediavine's expense. As described herein, Mediavine transacted billions of ad impressions through Google's systems and paid exchange fees and related charges that were inflated through Google's unlawful and deceptive conduct.

303.    Google also retained revenue and margin derived from auction mechanisms—including Project Bernanke, Dynamic Revenue Sharing, Minimum Bid to Win, preferential routing, and related practices—that diverted value from publishers, including Mediavine, to Google.

304.    It would be against equity and good conscience to permit Google to retain these benefits because they were obtained through exclusionary conduct, deceptive practices, and the manipulation of auction rules and reporting mechanisms that distorted competitive outcomes.

92

Google's deceptive practices extended beyond the specific representations contained in its agreements with Mediavine and included additional misrepresentations and omissions concerning the operation of AdX auctions, the use of publisher data, and the transparency of Google's auction mechanics.

305. Mediavine lacks an adequate remedy at law for the full measure of Google's unjust gains, and equity requires restitution and disgorgement of the benefits Google wrongfully obtained.

306. Accordingly, Mediavine seeks restitution, disgorgement of ill-gotten gains, and such other equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

307. Plaintiff Mediavine, Inc. requests that, following a jury trial in this case, the Court enter judgment in its favor and against Defendant Google LLC as follows:

a. That the Court declare, adjudge, and decree that Google has committed the violation(s) of Sherman Act Sections 1 and 2 alleged herein;

b. That the Court award damages recoverable under the federal antitrust laws, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, including damages arising from conduct affecting U.S. commerce to the fullest extent permitted by law.

c. That the Court declare, adjudge, and decree that Google has committed unlawful and deceptive acts in violation of New York General Business Law §§ 349-50 and common law fraud, and has unjustly enriched itself at Mediavine's expense.

93

d.    That the Court award any actual, compensatory, or punitive damages, reasonable attorneys' fees, costs, restitution, disgorgement of ill-gotten gains, and all other monetary and equitable relief permitted under law for these violations.

e.    That Google, its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any of the foregoing persons or entities be enjoined and restrained permanently from the unlawful conduct;

f.    That the Court enter structural relief as needed to cure any anticompetitive harm;

g.    That the Court award to Mediavine its reasonable costs and expenses incurred in connection with this action, including expert fees and attorneys' fees; and

h.    That the Court grant Mediavine such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

308.    Mediavine hereby demands a jury trial for all issues so triable.

Dated: March 20, 2026                    Respectfully Submitted


                                         _____/s/  *Brandon Kressin*_____
                                         Brandon Kressin
                                         Richard Powers (*pro hac vice* forthcoming)
                                         Christian Lorenz (*pro hac vice* forthcoming)
                                         Kressin Powers LLC
                                         400 Seventh Street NW, Ste 300
                                         Washington, DC 20004
                                         Email: brandon@kressinpowers.com
                                                richard@kressinpowers.com
                                                christian@kressinpowers.com


                                         *Counsel for Mediavine, Inc.*